

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,019

**BILLIE WAYNE COBLE, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM THE 54TH JUDICIAL DISTRICT COURT
### McLENNAN COUNTY

COCHRAN, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.  MEYERS, J., joined except for points of error 3 and 4.  KELLER, P.J., filed a concurring opinion in which MEYERS and KEASLER, JJ., joined.  HERVEY, J., concurred.

### OPINION

Appellant was originally convicted in 1990 of capital murder for the shooting deaths of his wife's mother, father, and brother.  Based upon the jury's answers to the special punishment issues, the trial judge sentenced him to death.  This Court upheld his conviction and sentence on direct appeal.[1]  In 2007, the Fifth Circuit Court of Appeals granted habeas

---

[1] *Coble v. State*, 871 S.W.2d 192 (Tex. Crim. App. 1993).

relief and remanded the case for a new trial on punishment.[2]  On retrial in 2008, a second jury sentenced appellant to death.  Appellant raises twenty-five points of error.  Finding no reversible error, we affirm the judgment and sentence.

## Factual Background

Karen Vicha was appellant's third wife.  They were married in July 1988 and lived in a house down the road from her brother and across the street from her parents.  Appellant was almost forty years old.  The marriage quickly disintegrated,[3] and, after a year, Karen told appellant to move out.  She wanted a divorce.  Appellant attempted to talk her out of this decision and would randomly call her and show up at her work place.

Appellant then kidnapped Karen as a further effort to dissuade her from divorcing him.  He hid in the trunk of her car while she was at a bar one evening with a girlfriend. When Karen started to drive home, appellant folded down the back seat and "popped out of the trunk with a knife."  He jumped over the console, halfway into the front seat, and stuck the knife against Karen's ribs.  He told her to keep driving until they came to a field.  Karen stopped the car, and appellant said that he if couldn't have her, then no one else could.  He pulled out a roll of black electrical tape, but Karen kept talking, and, after about two hours, she convinced him that she would reconsider the divorce issue.  He let her go, and she called her brother, Bobby, who was a police officer.  Bobby told Karen to report the kidnapping.

---

[2] *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007).

[3] Karen was worried by appellant's sudden personality switches from calm to aggressive– "agitated and angry"–as well as his interest in watching young girls.

After he arrested appellant for kidnapping Karen, Officer James Head looked in his patrol-car mirror and saw appellant staring at him with a look that "made the hair on the back of [his] head stand up." He got "the heebie-jeebies." Appellant muttered something like "They're going to be sorry." Officer Head called Karen's brother, Bobby, and warned him about appellant. When appellant was released on bail for the kidnapping charge, Bobby got Karen a German shepherd for protection. A few days later, appellant told Karen, "Oh, I see you–you've got a dog now. . . . [T]hat's a big mean dog you've got." Shortly thereafter, Karen found the dog lying dead in front of her house.

Nine days after he had kidnapped Karen, appellant went to her house in the early afternoon. As Karen's three daughters each came home from school along with Bobby's son,[4] appellant handcuffed them, tied up their feet, and taped their mouths closed. Karen's oldest daughter testified that she heard appellant cut the telephone lines. Then he left to ambush and shoot Karen's father, mother, and brother Bobby as each of them came home.[5]

Appellant returned to Karen's house after the triple killings and waited for his wife to come home from work. He told the children, "I wish I had blown you away like I intended

---

[4] All four children, ages 16, 14, 11, and 10, testified that they had liked appellant prior to the murders.

[5] Karen's father, the first victim, was found inside his home, covered with blankets and towels. Karen's mother was found in her garage. Bobby was found in his car in his garage.
Later that day, appellant told Karen that her brother was tough. "He put up one hell of a fight. . . . I chased him down the road one way, and I chased him back. And then I shot him, and he was going for the gun in his car. And he wouldn't die. . . . So, finally I had to blow a hole that big in his neck." Appellant also told Karen that he "really hated to do that to your mom. But when she found out about your dad, she just went crazy."

to." When Karen arrived, appellant came out of one of the bedrooms with a gun. Appellant said, "Karen, I've killed your momma and your daddy and your brother, and they are all dead, and nobody is going to come help you now." She didn't believe him, so appellant showed her Bobby's gun lying on the kitchen table and pulled the curtains so she could see her father's truck parked behind the house. He showed her $1,000 in cash that he had taken from her mother. Appellant told Karen that she was lucky that he hadn't molested her daughters, and he told her to kiss them good-bye. She did. He made her put on handcuffs. Karen talked appellant into leaving the house and taking her with him.[6] He said he was going to take her away for a few weeks and torture her.[7]

As appellant drove, Karen tried to escape by freeing one hand from the handcuffs and grabbing at the steering wheel, making the car swerve into a ditch. She grabbed one of appellant's guns, pointed it at his stomach, and pulled the trigger, but nothing happened. Then Karen and appellant fought over the gun, with appellant repeatedly pulling the trigger, but still the gun did not fire. Appellant pistol-whipped Karen until she couldn't see for all of the blood on her face. A woman passerby started shouting at appellant, "[W]hat are you

---

[6] While Karen and appellant were still at her house, Bobby's girlfriend dropped by and saw Karen in handcuffs. She then went to Bobby's house and called Karen's uncle to tell him about seeing Karen in handcuffs. After that call, she looked around Bobby's house and saw blood everywhere, plants and furniture up-ended, and general disarray. She called the sheriff's office. Officers then came to Karen's house, talked to the four children, found the bodies of the three victims, and started the hunt for appellant.

[7] Karen testified that when she came to a court hearing in 1998, appellant kept turning around and smiling at her with "a wicked evil grin." Even in 2008, she was still scared of him and felt that he was a continuing threat to her.

trying to do to that woman," so appellant drove the car out of the ditch as Karen lay in the passenger seat. He shouted at her that if she got blood on his clothes, he would kill her. But he was also rubbing her between her legs as he drove. He told her that his reputation was ruined because she had had him arrested and his name was in the papers.

He drove to a deserted field in Bosque County where he threatened to rape her. After dark, he drove out of the field, but they passed a sheriff's patrol car which turned around to follow them. Appellant grabbed a knife and started stabbing Karen's chin, forehead, and nose, as he was driving. Appellant said that he did not want to die in prison, so he "floored it" and rammed into a parked car. After the crash, appellant turned to Karen and said, "I guess now you'll get a new car." Both appellant and Karen were injured in the crash. Officers had to cut the car door open to get Karen out. Appellant was found with Karen's father's watch and wallet, as well as .37 and .38 caliber revolvers.

Although appellant was forty years old when he committed this triple murder, the State's evidence showed that he was no stranger to violence. He had a long history of brutalizing and molesting women. Appellant beat both of his former wives and molested several young girls, including relatives.

His first wife, Pam Woolley, testified that they were married in 1970 when appellant was twenty-two. They had two children, but their marriage started downhill after two years. By 1974, appellant had become violent, and he used to beat her on the head so that her hair

would hide the marks.[8]  Pam said that appellant could go from normal to extremely angry in a split second, and he always blamed her for his violent acts.  Appellant told her that if she ever filed for divorce, he would "fix her" so no other man would look at her again.

During this ten-year marriage, appellant molested Pam's younger sister and punched her on the mouth, "busting" her lip.  He molested his children's thirteen-year-old babysitter while teaching her how to water ski.  He groped the breast of another neighborhood girl.  In 1979, when appellant was thirty, he raped his cousin who was about fifteen at the time.  When appellant's niece was fifteen, he grabbed her ankles as she sat in a chair wearing a nightgown, spread open her legs, and gestured with his tongue as if he were performing oral sex on her.  Later that same day, he forcibly kissed her and then threw her a $5 bill.

Appellant married Candy Ryan, his second wife, when he was thirty-five and she was eighteen.  After one year of marriage, appellant started physically abusing her.  He regularly hit her on the head.  Once he grabbed her by the hair and repeatedly hit her against the cabinet and floor.  After she dared to throw something at him, he hit her with a sledge hammer.  Candy said that appellant had a "switch-type" personality–changing from sweet to nasty in a split-second.  He stalked her, both during and after their marriage.  He would sit in his car outside the gas station where Candy worked, and, if a customer stayed inside too long, appellant came in and gave the customer an intimidating look.  After  Candy left

---

[8] He also threw a plate at Pam when she cooked something he did not like; he knocked her to the floor with an open-hand slap; he hit her on the back with a baseball bat so hard that she had to go the hospital; and he sat on her chest and punched her in the face, breaking her nose.

appellant, he would call her late at night and tell her where she had been, whom she had been with, and what she had been doing.  Appellant threatened Candy's father when he tried to help Candy leave.

Appellant's childhood did not augur well for his future.  His earliest years were spent in the custody of an alcoholic stepfather who worked only periodically and a sickly, withdrawn, and depressed mother.  When appellant was four, his mother was institutionalized in the Austin State Hospital with a psychoneurotic disorder.  Appellant, his brother, and his older sister were sent to the Corsicana State Home for Children.  Because of her promiscuous acting-out, appellant's older sister was sent to a convent school, and his problematic older brother was placed under the supervision of the Waco Probation Department.  Appellant remained at the Home for twelve years.

When appellant was fifteen, a psychiatrist, Dr. Hodges, evaluated him and concluded that he was paranoid, distant, and impulsive; he showed poor self-control, displayed hostility to women, and blamed others for his own bad conduct.  Dr. Hodges's impression was that appellant "represent[ed] a sociopathic personality disturbance of the dissocial type." People with this diagnosis gratify their own desires without regard for the cost to others.  Appellant's "long term prognosis [did] not look good."

At age seventeen, appellant joined the Marine Corps and was sent to Vietnam.  Although he received an honorable discharge after his four-year tour of duty, he was not recommended for re-enlistment because of a series of violations and convictions.  He married

his first wife shortly after he left the Marines.

Dr. Richard Coons, a psychiatrist, had testified at appellant's 1990 trial that he would be a future danger. Dr. Coons testified at the 2008 retrial that appellant would still be a future danger even though appellant did not have a single disciplinary report for the eighteen years that he had been on death row. Dr. Coons explained this discrepancy by stating that all those on death row have an incentive to behave because their convictions are on appeal, and thus they are less violent than they would be in the general prison population.

Appellant called several witnesses to attest to his prison reformation and lack of violence for the entire time that he had been on death row. According to one fellow inmate, appellant was well liked by everyone; he was always even-tempered and had the ability to "talk sense" into some of the more violent inmates. He said that appellant had organized a sports league at the Ellis Unit and that he helped inmates write letters and would read them their letters from family members. After Death Row was moved to the Polunsky Unit, appellant's behavior was the same; he was always helpful and upbeat.

Another inmate testified that appellant would take people "under his wing" and help the "agitated" ones. He stated that, while at the Ellis Unit, appellant was an SSI, which was like a trustee, and would often walk around with female officers. A third inmate testified that appellant was generous and gave commissary items to other inmates. A fourth inmate said that appellant helped him to learn English and to file a federal habeas petition. Appellant helped mentally-retarded inmates and was known for his respect for the law and God.

Appellant's older sister testified about their childhood and how appellant changed for the worse after coming home from Vietnam. She said that, shortly before the triple murders, she saw appellant throwing away many of his most prized possessions, and he began talking about his experiences in Vietnam, something he had never done before. On the day of the murders, appellant threw his truck keys at her and said that, if anything happened, the truck was hers. Appellant's son testified that appellant taught him welding, and he described his father as loving and helpful to others.

Dr. Cunningham, a forensic psychologist, testified that he had reviewed appellant's prison record which contained no disciplinary write-ups. Dr. Cunningham conducted a violence risk assessment of appellant. In his opinion, appellant had a very low probability of committing acts of violence while in prison.

**Sufficiency of the Evidence to Prove Future Dangerousness**

In his first and second points of error, appellant asserts that the evidence is legally and factually insufficient to support the jury's finding that there is a probability that he would commit criminal acts of violence in the future. As appellant acknowledges, we have consistently held that we lack authority to conduct a factual sufficiency review of the jury's future-dangerousness verdict.[9] Appellant's arguments do not persuade us otherwise.

In assessing the legal sufficiency of the evidence to support future dangerousness, we

---

[9] *See McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998); *see also Williams v. State*, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) ("We do not apply a factual-sufficiency review to the jury's answer to the future-dangerousness special issue.").

"view the evidence in the light most favorable to the jury's findings and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society."[10]  Only if, after reviewing all of the record evidence, we conclude that a rational jury would necessarily have entertained a reasonable doubt about the defendant's future dangerousness, will we find that the evidence is legally insufficient.[11]

Appellant does not suggest that the evidence of his gruesome triple murder and his life-long history of violence toward women and young girls is–viewed in a vacuum–insufficient to support the jury's finding.  Clearly it is sufficient.  Instead, he argues that, like Saul on the road to Damascus, he has experienced a character conversion while spending the last eighteen years in prison with a spotless disciplinary record.  He has proven that he no longer poses any realistic threat of violence.  This is, at first blush, a compelling argument.

Appellant notes that he was almost sixty years old and in poor health[12] at the time of the present trial.  Appellant points to the evidence that shows that he has not merely stayed out of trouble for eighteen years in prison, but that he has made positive contributions to his prison society.  He worked in the prison garment factory when he was housed in the Ellis

---

[10] *Berry v. State*, 233 S.W.3d 847, 860 (Tex. Crim. App. 2007) (citation omitted).

[11] *Id.*

[12] Medical evidence showed that appellant has a history of heart disease, including a heart attack in 2004.  He takes medications for high blood pressure and high cholesterol.

Unit; he helped diffuse potential conflicts by talking "sense" into frustrated inmates; he formed a prison sports league; he gave commissary items to inmates who did not have money; he helped an inmate learn English and draft legal papers. Dr. Cunningham, his expert forensic psychologist, placed appellant in the lowest risk group for violence in prison. But, as the prosecutors pointed out, appellant had done many of these same positive things before the murders as well: he coached one of Karen's daughter's baseball teams; he fixed things around the house; he tended the garden; he praised Karen; he repaired their car; he helped organize a school sports banquet. Appellant's son, Gordon, testified that his father helped him with sports and took him fishing and hunting. He taught Gordon welding, electrical work, and a good work ethic. He was a very patient teacher and friendly, talkative, happy, and helpful to others.

Appellant agrees with the proposition that "the past is the best predictor of the future," and he relies upon a spotless, positive prison record as a realistic predictor of the future. Appellant concludes that, "[i]n light of [his] age and his prison record, . . . the only rational finding in this case is that he would not be a continuing threat to society. For that reason, his sentence must be vacated."[13]

This is the same argument that appellant made during the trial, and the jury must have taken it seriously because it asked for just three pieces of evidence during its deliberations, evidence that was directly relevant to this argument:

---

[13] Appellant's Brief at 31.

(1)    Dr. Hodges's Austin State School psychiatric report from 1964 when appellant was 15. That report stated that appellant seemed paranoid and distant and "extremely hostile to women"; Dr. Hodges's impression was that "this boy represents a sociopathic personality disturbance of the dissocial type."[14] He concluded, "The long term prognosis does not look good."

(2)    The military medical record from appellant's 1967 self-inflicted stabbing wound in his thigh after he had a fight with his girlfriend.[15] According to the military doctor, appellant "revealed evidence of lifelong maladjustment." On the hospital ward he was "hostile and belligerent" and only slowly "began to conform to the ward milieu."

(3)    The pictures and cards that appellant had in his death row cell. These included numerous pictures of scantily clad young women and girls–young gymnasts and skaters–as well as romantic cards and photographs from a female pen pal.

---

[14] During the psychiatric interview, appellant "talked at some length about [a] fairly involved series of thefts and many anti-social acts such as stealing the ball bearings out of other children's bicycles so the wheels would not roll because he did not have a bicycle." Appellant told Dr. Hodges about "several thefts and [a] burglary in which he and his brother were suspected which he never admitted to the police but which he readily told me about during the interview." The penultimate paragraph of Dr. Hodges's report reads,

[Appellant] seemed rather paranoid, distant, and deliberately non-smiling, as if he must deliberately keep people away from him to avoid the hurt from further rejection and hostility. He said that he did have some friends, but throughout the interview he seemed extremely hostile to women, made very deprecating remarks about them, and in general seemed to have a very low opinion of women. For instance, he told of beating up a young girl in the classroom because she said something smart to him, and he seemed impulsive, had poor controls, a very low self-esteem and he seemed to project a great deal of responsibility for his own actions on other people.

[15] The medical report set out appellant's explanation for the injury:
According to the patient, his fiancée came from Texas so that he and she could become married. He had arrived from Da Nang and had met her and she was in an apartment with another fellow. The patient thought that his fiancée was having an affair with this other fellow and he became so angry and enraged that he threatened to kill him and also threatened to kill his fiancée. He stated that while he was involved in a fight, he picked up a knife and accidentally stabbed himself in the right thigh. His previous story, upon admission, was that he attempted to kill himself and was trying to stab himself in the abdomen and missed, finally stabbing himself in the right thigh.

The jury had also heard from several different sources about appellant's mercurial moods: one moment calm and sweet, the next moment in a towering rage.[16]

The jury also heard evidence that appellant, after all his time on death row, was still hostile to women. Karen testified that when she appeared for a hearing in 1998, almost ten years after appellant's original conviction, appellant "turned around and watched me sit down. And then, after that, he kept turning around and looking at me and grinning." It was a "weird evil grin." Karen "called it to the Judge's attention, and then he told him to stop. And then, he did it again. And [the judge] told him–I think his words were, I have to admonish you for that and I'll have to call you in contempt if you don't stop it." According to Karen, appellant had that same grin when she testified at the 2008 trial.

Appellant's attorney explained at trial that, "I'm not saying Bill Coble is a different person–okay–than he was in 1989. But you can see that he's made changes. You can see that he has adapted himself to prison environment, that[] he's adapted himself to institutional life. That's very clear." That is clear; appellant has adapted very well to prison life, but that fact, by itself, does not resolve the special issue:

> Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?[17]

---

[16] Karen testified that she was really scared when she and appellant were in the Bosque County field after the murders because appellant would veer from pistol-whipping her and threatening to kill her to wanting to carry her over the brambles in the field so she wouldn't stumble and hurt her bare feet.

[17] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

This question is essentially a normative one as the Legislature declined to specify a particular level of risk or probability of violence.[18]   But the "future dangerousness" special issue ensures that no defendant, regardless of how heinous his capital crime, will be sentenced to death unless  the jury finds that he poses a  real threat of future violence.

The special issue focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person.[19]   As we

---

[18] *See Jurek v. State,* 522 S.W.2d 934, 945 (Tex. Crim. App. 1975) (Odom, J., concurring and dissenting).  As Judge Odom complained, the Legislature declined to specify any particular level of probability in this special issue:

> What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a "probability" that he will perform certain acts in the future? Did it mean, as the words read, is there *a* probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, *a* probability, and no one would say it is no probability or not a probability. It has been written: "It is probable that many things will happen contrary to probability," and "A thousand probabilities do not make one fact."  The statute does not require a particular degree of probability but only directs that *some* probability need be found. The absence of a specification as to what degree of probability  is required is itself a vagueness inherent in the term as used in this issue. Our common sense understanding of the term leaves the statute too vague to pass constitutional muster.

*Id.* (footnote omitted).  But the Supreme Court disagreed with Judge Odom's constitutional concerns about the vague nature of "a probability" in the special issue. *See* note 19 *infra*.

[19] In upholding the Texas death penalty scheme and its special issues in *Jurek v. Texas*, 428 U.S. 262 (1976), the United States Supreme Court agreed that it is

> not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. . . .  The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.  What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

recently stated in *Estrada v. State*,[20] "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat 'whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life."[21]  That is, this special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration.  It is theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, but incapacitation is not the sole focus of the Legislature or of our death penalty precedents.[22]

---

*Id.* at 274-76.  Thus, the Supreme Court focused on the particular characteristics of the individual defendant himself, not upon an outside entity to constrain or control the individual defendant.  It did not disagree with this Court's original opinion in *Jurek* which had suggested possible types of evidence that jurors could use in assessing the probability that the defendant would commit future acts of violence:

> In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record.  It could consider the range and severity of his prior criminal conduct.  It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another.  It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.

522 S.W.2d at 939-40.  These are all factors that relate to the individual defendant, not to the efficacy of external controls.

[20] 313 S.W.3d 274 (Tex. Crim. App. 2010).

[21] *Id.* at 281.

[22] *See, e.g.*, *Druery v. State,* 225 S.W.3d 491, 506-07 (Tex. Crim. App. 2007) ("State has the burden of proving beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison"); *Smith v. State,* 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.) (how long a life-sentenced capital defendant will spend in prison "is not proper even in the context of the [future-dangerousness] special issue because when a jury is considering

The Supreme Court has stated that "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."[23]   Thus, juries appropriately focus upon the defendant's individual character for violence and the probability that he would commit acts of violence in whatever society he found himself.[24]  Obviously, the likelihood that a defendant does not or will not pose a heightened risk of violence in the structured prison community is a relevant, indeed important, criterion, but it is not the exclusive focus of the "future dangerousness" issue.

There is no denying appellant's impressive history of nonviolence in prison.  Nor did the prosecutors at trial try to minimize that record.  They noted that appellant has always done some good things in his life.  The issue, however, is whether he is the same person–with

---

whether a defendant represents a continuing threat to society, the term 'society' includes both the prison and non-prison populations").

[23] *Kansas v. Marsh,* 548 U.S. 163, 173-74 (2006).

[24] In proving future dangerousness, the State may rely on several factors, including but not limited to: (1) "the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties," (2) "the calculated nature of the defendant's acts," (3) "the forethought and deliberateness exhibited by the crime's execution," (4) "the existence of a prior criminal record, and the severity of the prior crimes," (5) "the defendant's age and personal circumstances at the time of the commission of the offense," (6) "whether the defendant was acting under duress or the domination of another at the time of the offense," (7) "psychiatric evidence," and (8) "character evidence." *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).  These factors do not constitute an exhaustive list.  *Barnes v. State*, 876 S.W.2d 316, 322 (Tex. Crim. App. 1994).  Significantly, these factors do not include the incapacitation capacity or competency of the particular prison system.

the same character for sudden explosive violence–that he was when he was diagnosed at age 15 as having a "sociopathic personality disturbance of the dissocial type." Has his character changed since he was again diagnosed as having a lifelong history of maladjustment, belligerence and violence, when he was hospitalized at the age of 19 after fighting with his fiancee and stabbing himself in the thigh as a Marine? Was the "evil grin" Karen said that he gave her in court when appellant was fifty years old, and then again when he was sixty, indicative of a continuing animosity and character for brutality toward women? And did the pictures in his death row cell indicate an unnatural interest in young, athletic, scantily clad women for a sixty-year-old man with a heart condition? It was the jury's duty to assess appellant's present character for future dangerousness, and there was ample evidence to support its finding, beyond a reasonable doubt, that appellant had not experienced a conversion on the road to Damascus; rather, he had the same character for violence at age 60 that he did at ages 15, 19, and 40, despite his spotless prison record.[25]

The evidence is legally sufficient to support the jury's finding on the future dangerousness special issue. We overrule points of error one and two.

### The Admissibility of Dr. Coons's Expert Testimony

---

[25] *See, e.g., Blue v. State*, 125 S.W.3d 491, 493-96 (Tex. Crim. App. 2003) (evidence sufficient to support jury's finding of future dangerousness despite defendant's evidence of nonviolence on death row for seven years before retrial and expert testimony that there was no more than a 48% statistical probability that defendant would commit acts of violence in prison because his prior violence was largely "relationship-driven"; evidence showed that defendant doused his girlfriend in gasoline and set her afire and he had a lengthy history of abusing other women, especially current and former girlfriends).

In points of error three and four, appellant contends that Dr. Richard Coons's expert testimony concerning future dangerousness was not admissible under Rule 702[26] because it was insufficiently reliable.  We agree.  In point of error five, appellant asserts that this type of evidence fails to meet the heightened reliability requirement of the Eighth Amendment, but the United States Supreme Court, in *Barefoot v. Estelle*,[27] rejected this argument, and we are required to follow binding precedent from that court on federal constitutional issues.[28]

**A.     The *Daubert/Kelly* Hearing.**

At trial, appellant objected to Dr. Coons's proposed testimony and requested a *Daubert/Kelly*[29] hearing outside the presence of the jury.  At that hearing, Dr. Coons testified that he is board certified in general psychiatry and has been practicing forensic psychiatry for thirty-one years.  He has evaluated the competency or sanity of between 8,000 to 10,000 people, has performed 150 evaluations of "future dangerousness," and has testified in fifty trials as an expert.

---

[26] T EX. R. EVID. 702.  Rule 702 reads,
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

[27] 463 U.S. 880 (1983).

[28] *Casarez v. State*, 913 S.W.2d 468, 475 n.10 (Tex. Crim. App. 1994) ("As judges on this honorable Court, we are bound to apply the United States Constitution as interpreted by the Supreme Court; we do not have the luxury or the liberty to ignore binding precedent.").

[29] *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

Dr. Coons testified that psychiatric principles are commonly used when making determinations of a person's danger to himself or others in the context of involuntary psychiatric commitments. He said that he also relies upon psychiatric principles when he evaluates defendants for "future dangerousness" for capital murder trials. He repeatedly stated that "the best predictor of the future is the past" and noted that

> there are certain trends in people who are, in other words, habit patterns or personality patterns that–that we rely on. Um, and then, of course, there's the experience one has, the training and then the experience that one has in seeing quite a number of people and, uh–uh–watching classifications within various jails and so forth. Uh, those are kind of the principles or the things that are –opinions are based on.

Dr. Coons noted that there are some psychiatric diagnoses that are listed in the DSM,[30] such as antisocial personality disorder, that might indicate that a person is dangerous. But in this case, Dr. Coons relied on materials supplied by the District Attorney's Office.

Dr. Coons explained his standard methodology in assessing the issue of future dangerousness. For at least the past twenty years he has relied upon several different factors:

(1)    The person's history of violence;

(2)    The person's attitude toward violence;

(3)    The particulars of the criminal offense;

(4)    The person's personality and general behavior;

(5)    The person's conscience; and

(6)    Where the person will be–in or out of prison.

---

[30] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS.

He assesses these factors based on the information that he has been given.  This is his own personal methodology.  He does not know whether others rely upon this method, and he does not know of any psychiatric or psychology books or articles that use his factors.  But "[t]hese are matters that are discussed commonly at–at forensic meetings and among forensic psychiatrists. . . . [B]ut generally speaking, those are the–are the kinds of things that, uh, forensic psychiatrists would take into consideration in reaching an opinion."  He doubts that his methodology is shared by everyone because different psychiatrists construct their own methodologies.

Dr. Coons stated that multiple psychiatrists would not necessarily agree on what is important in the first factor–looking to past conduct to predict future conduct.  "I'm the one who's making the decision–about whether it means something to me in terms of what I–my education or experience or background is."  It is a subjective evaluation.  When assessing past violence, Dr. Coons looks at its nature and context.

The same subjectivity is true for the second factor, a person's attitude about violence, as well as the third factor, the circumstances of the offense.  Two different psychiatrists may come to different conclusions based on the same facts.  Dr. Coons said that forensic psychiatrists develop an experiential body of knowledge and information and approach that helps them make their decisions. But Dr. Coons disagreed that it was "just a gut feeling."

When it comes to the fourth factor of personality and behavior, Dr. Coons looks to whether the crime was an aberration or whether that person has had a problem looking out

for other people. Is he controlling? Manipulative? With the fifth factor, "conscience is involved in–in helping people control their behavior. And, I mean, really, I guess almost everybody knows that." There is no yardstick to measure it. With the final factor, Dr. Coons stated that if the person is on death row he will be less violent because "everybody that's on death row is on appeal by definition. And they tend to be on their good behavior. Uh, because if they–on their bad behavior and they get another trial or punishment, they uh–they know they'll hear about it again. Their violence on death row or threats or whatever."[31]

All of these factors overlap and blend, but Dr. Coons knows of no book or article that discusses these factors or their overlap. He is not aware of any studies in psychiatric journals regarding the accuracy of long-term predictions into future violence in capital murder prosecutions or of any error rates concerning such predictions. Nor is he aware of any psychiatric studies which support the making of these predictions. Dr. Coons has never gone back and obtained records to try to check the accuracy of the "future dangerousness" predictions he has made in the past. He cannot tell what his accuracy rate is.

On redirect, the prosecutor asked Dr. Coons to read from a legal brief containing the names and titles of some articles on future dangerousness that had been filed in a different case, but Dr. Coons was not familiar with any of those articles.

---

[31] Dr. Coons admitted that there is no objective way of differentiating between the two locations, death row versus general population, "[j]ust logic. . . . I think if you took a thousand psychiatrists and presented that to them, most people would say they have motivation to be on their better behavior if they're on death row." But Dr. Coons stated that there is no objective way of proving that proposition and he knows of no studies that support that theory.

Based on this testimony, the trial judge found that Dr. Coons qualified as an expert witness, that the subject matter of his testimony was an appropriate one for experts, and "that admitting the expert testimony will actually assist the factfinder in deciding this case."

Dr. Coons then testified before the jury and, in response to a lengthy hypothetical setting out the salient features of appellant's life and crimes, opined that there was a probability that appellant would commit future acts of violence.

**B.**    **Legal Principles Concerning the Admission of Expert Psychiatric or Psychological Testimony Concerning Future Dangerousness.**

The admission of expert testimony is reviewed on appeal for an abuse of discretion.[32] However, trial judges must act as a true "gatekeeper" when addressing the reliability and relevance of expert testimony.[33] In *Daubert,* the United States Supreme Court held that when the subject of the expert's testimony is "scientific knowledge," the basis of his testimony must be grounded in the accepted methods and procedures of science.[34]   As that court explained,

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation–*i.e.*, "good grounds," based on what is known.  In short,

---

[32] *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997) ("[T]he trial court's judgment regarding experts' qualifications and the admissibility of expert testimony is subject to an abuse of discretion standard of review.").

[33] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993); *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999) ("gatekeeping" role assigned to trial judges under *Daubert* applies the same reliability standard to all "scientific," "technical," or "other specialized" matters within the scope of Rule 702).

[34] *Daubert*, 509 U.S. at 589-90.

the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.[35]

Four "general observations" guide the inquiry into scientific reliability: (1) falsifiability; (2) peer review and publication; (3) the existence of methodological standards, including the error rate; and (4) general acceptance within the relevant scientific field.[36] The goal of these "flexible" guidelines is to evaluate the admissibility of expert testimony by the standards that comparable experts within the same scientific field use in evaluating each other's professional work.[37]

In *Kelly v. State*,[38] this Court adopted several procedural and substantive limitations upon the admission of expert scientific testimony to ensure that unreliable expertise would be excluded from the jury's consideration.[39] Under *Kelly*, a trial judge must, upon request, conduct a "gatekeeping" hearing outside the presence of the jury to determine whether scientific evidence is sufficiently reliable[40] and relevant[41] to help the jury in reaching an

---

[35] *Id.* at 590.

[36] *Id.* at 593-94.

[37] *See id.*

[38] 824 S.W.2d 568  (Tex. Crim. App. 1992).

[39] *Id.* at 572-73.

[40] In *Kelly*, we set out the following list of nonexclusive factors that a trial court could consider in determining scientific reliability:
(1)     The extent to which the underlying theory and technique are accepted as valid by the relevant scientific community;
(2)     The qualifications of the testifying expert;
(3)     The existence of literature supporting or rejecting the underlying scientific theory and

accurate result.  Then the judge must decide whether, on balance, that expert testimony might

nonetheless be unhelpful or distracting for other reasons.[42]  To be considered reliable,

evidence from a scientific theory must satisfy three criteria: "(a) the underlying scientific

theory must be valid; (b) the technique applying the theory must be valid; and (c) the

technique must have been properly applied on the occasion in question."[43]  The trial court's

essential gatekeeping role is to ensure that evidence that is unreliable because it lacks a basis

in sound scientific methodology is not admitted.[44]

Forensic psychiatry is certainly a science;[45] as Dr. Coons stated, it is practiced solely

---

technique;
(4)     The potential error rate;
(5)     The availability of other experts to test and evaluate the technique;
(6)     The clarity with which the underlying scientific theory and technique can be explained to the court; and
(7)     The experience and skill of the person who applied the technique in this case.
*Id.* at 573.

[41] In *Jordan v. State*, 928 S.W.2d 550, 553-54 n.4 (Tex. Crim. App. 1996), we discussed the "relevance" prong of the gatekeeping analysis as the closeness of the "fit" between the scientific evidence and the fact to which it is offered.  "Whether evidence 'will assist the trier of fact' and is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable."  *Id*. at 555.

[42] *Kelly*, 824 S.W.2d at 572.

[43] *Id.* at 573.

[44] *Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997).

[45] Forensic psychiatry is defined as "the branch of medicine that deals with disorders of the mind and their relation to legal principles."  Thomas G. Gutheil, LEGAL ISSUES IN PSYCHIATRY, IN COMPREHENSIVE TEXTBOOK OF PSYCHIATRY/VI 2747 (Harold I. Kaplan & Benjamin J. Sadock eds., 1995).  The official definition of forensic psychiatry, promulgated by the American Board of Forensic Psychiatry and adopted in the Ethical Code of the American Academy of Psychiatry and the Law, is "a subspecialty of psychiatry in which scientific and

by those with a medical degree.[46]  It may be a "soft science," but trial courts, in their

gatekeeping function, must ensure that the expertise is not only soft, but that it is science as

well.[47]  "Soft" science does not mean soft standards.[48]  When "soft" sciences are at issue, the

trial court must inquire "(1) whether the field of expertise is a legitimate one, (2) whether the

subject matter of the expert's testimony is within the scope of that field, and (3) whether the

expert's testimony properly relies upon and/or utilizes the principles involved in the field."[49]

    This inquiry is somewhat more flexible than the *Kelly* factors applicable to Newtonian

---

clinical expertise is applied in legal contexts involving civil, criminal, correctional, regulatory or legislative matters, and in specialized clinical consultations in areas such as risk assessment or employment.  These guidelines apply to psychiatrists practicing in a forensic role." *Ethics Guidelines for the Practice of Forensic Psychiatry* (Am. Acad. Psychiatry & L. May 2005).

[46] There is some empirical evidence that jurors tend to rate medical expertise higher than "mere" scientific evidence, such that when the information is identical, jurors rate the testimony from a psychiatrist, a medical doctor, as more persuasive than that from a psychologist. *See* J. Greenberg & A. Wursten, *The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence*, 19 PROF. PSYCHOL. RES. & PRAC. 373, 378 (1988).  This might be termed "the Marcus Welby Effect" from the 1970's television series of the same name.

[47] *See, e.g., Holiday v. State*, No. AP-74,446–AP-74,448, 2006 WL 288661 *1 (Tex. Crim. App. February 8, 2006) (Womack, J., dissenting) (not designated for publication) ("If it cannot be validated, it's not science.  Not even soft science.  It may be soft, as many things are, but it's not science.").

[48] *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) ("[I]t seems exactly backwards that experts who purport to rely on general engineering principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique. The moral of this approach would be, the less factual support for an expert's opinion, the better.").

[49] *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) (upholding the admission of expert testimony by a special agent in the Behavioral Sciences unit of the FBI concerning future dangerousness in a capital murder trial).  Although *Nenno* dealt with the admission of expert testimony concerning future dangerousness, it dealt with testimony by a layman whose analysis was based on his experience studying sexual victimization of children. *Id.* at 562.

and medical science.[50] "The general principles announced in *Kelly* (and *Daubert*) apply, but the specific factors outlined in those cases may or may not apply depending upon the context."[51] Under either *Daubert/Kelly* or *Nenno*, reliability should be evaluated by reference to the standards applicable to the particular professional field in question.[52]

Appellant does not quarrel with the first prong– the legitimacy of the field of forensic psychiatry, nor, apparently, with the second prong–Dr. Coons's testimony is within the scope of forensic psychiatry, but he contends that Dr. Coons's testimony did not properly rely upon the accepted principles of forensic psychiatry, at least as far as those principles apply to the prediction of long-term future dangerousness.

While the United States Supreme Court (as well as other American courts) has recognized the fallibility of psychiatric assessments of future dangerousness, it nevertheless acknowledged the necessary reliance on psychiatry to assist in judicial decisionmaking.[53] We

---

[50] *Id.* at 561.

[51] *Id.* at 560.

[52] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (*Daubert* requires the trial court to assure itself that the experience-based expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

[53] *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983). The dissent in *Barefoot* noted that the American Psychiatric Association, in an *amicus curiae* brief, estimated that two out of three predictions of long-term future violence made by psychiatrists are wrong. *Id*. at 920 (Blackmun, J., dissenting). More recent psychiatric and legal articles have reached a similar conclusion, although some conclude that the accuracy of clinicians' predictions may now be slightly better than chance when they also use risk assessment and actuarial tools. *See,* Daniel W. Shuman & Bruce D. Sales, *The Admissibility of Expert Testimony Based Upon Clinical Judgment and Scientific Research*, 4 PSYCHOLOGY, PUBLIC POLICY AND LAW 1226, 1240 (1998) (stating that mental health clinicians' "future dangerousness" predictions fail to meet the scientific evidentiary

reaffirm that such expert testimony may, in a particular case, be admissible under Rule 702

standards in *Daubert;* noting that the stereotypes that mental health practitioners have of dangerous individuals are likely to be inaccurate and contain many attributes that are not linked to future danger); Grant H. Morris, *Defining Dangerousness: Risking a Dangerousness Definition,* 10 J. CONTEMP. LEGAL ISSUES 61, 85-86 (1999) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment.") (footnote omitted); William Gardner, Charles W. Lidz, Edward P. Mulvey, & Esther C. Shaw, *Clinical Versus Actuarial Predictions of Violence in Patients With Mental Illness*, 64 J. OF CONSULTING AND CLINICAL PSYCH. 602, 608-09 (1996) (suggesting that mental health practitioners are moderately better than chance in predicting future dangerousness based on recent estimates of their use of sophisticated statistical analysis techniques); John Monahan & Henry Steadman, VIOLENCE AND MENTAL DISORDER: DEVELOPMENTS IN RISK ASSESSMENT 109-10 (University of Chicago Press 1994) (mental health practitioners are generally unaware of the relevance of base rates of violence and thus greatly overestimate the likelihood that a specific individual will commit future violent acts); Daniel A. Krauss & Bruce D. Sales, *The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing*, 7 PSYCH. PUB. POL. & L. 267, 280-81 (2001) (stating that mental health practitioners make inaccurate future violence predictions, they lack training in making such predictions, and their predictions are biased by their reliance on several cognitive heuristics which cause them to overestimate rates of future violence, but noting that the "development of actuarial instruments specifically designed to forecast risk of future dangerousness has significantly improved the accuracy of predictions of future violence").  In summing up the findings of three other researchers spanning the years from 1982 to 2004, one group of authors stated:

> In making long-term predictive judgements [of dangerousness], however, pure clinical decisionmakers are inaccurate for a number of reasons.  Reasons for mental health practitioners' errors include such problems as (a) ignoring base rate information (the failure to take into account the normal level at which an event is likely to occur), (b) assigning non-optimal weights to factors (combining factors in manner that is subjectively appealing rather than empirically derived), and © employing the representativeness heuristic (the tendency to make decisions or judge information in a manner that fits our preconceived categories or stereotypes of a situation).

Daniel A. Krauss, Joel D. Lieberman, & Jodi Olson, *The Effects of Rational and Experiential Information Processing of Expert Testimony in Death Penalty Cases*, 22 BEHAV. SCI. LAW 801, 803 (2004).

and helpful to the jury in a capital murder trial.[54]  However, the burden is on the proponent

of such psychiatric testimony to establish its admissibility in each individual case.[55]  Science

is constantly evolving and, therefore, the Rule 702-703 "gatekeeping" standards of the trial

court must keep up with the most current understanding of any scientific endeavor, including

---

[54] At the time *Barefoot* was decided, and at the time Texas trial courts began admitting expert psychiatric and psychological testimony of "future dangerousness," the Supreme Court had not yet decided *Daubert*, and this Court had not yet decided *Kelly* or *Nenno*.  Those three cases have significantly altered the evidentiary threshold requirements of reliability and relevance of any expert's testimony, including psychiatric or psychological expertise.  Some have criticized the courts for failing to apply the standards set out in *Daubert* and *Kelly* to psychiatric testimony offered to prove future dangerousness in capital sentencing.  *See, e.g., Flores v. Johnson*, 210 F.3d 456, 464-65 (5th Cir. 2000) (Garza, J., concurring) ("The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific. It is as true today as it was in 1983 that '[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right.' . . . On the basis of any evidence thus far presented to a court, it appears that the use of psychiatric evidence to predict a murderer's 'future dangerousness' fails all five *Daubert* factors. . . . Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.").

[55] *See Hernandez v. State*, 116 S.W.3d 26, 30-31 (Tex. Crim. App. 2003) ("The State had the burden of proof at trial . . . to show, by clear and convincing evidence, that the ADx analyzer is a reliable method of determining the presence of marijuana in a person's body. It failed to offer *any* testimony, *any* scientific material, or *any* published judicial opinions from which the trial court might take judicial notice of its scientific reliability.") (footnote omitted); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) ("before novel scientific evidence may be admitted under Rule 702, the proponent must persuade the trial court, by clear and convincing evidence, that the evidence is reliable and therefore relevant"); *see also Daubert*, 509 U.S. at 592-93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.") (footnotes omitted).

the field of forensic psychiatry and its professional methodology of assessing long-term future dangerousness.[56] The objective of the "gatekeeping" requirement is to make certain that an expert employs the same professional standards of intellectual rigor in the courtroom as is expected in the practice of the relevant field.[57] The validity of the expert's conclusions depends upon the soundness of the methodology.[58]

---

[56] The State argues that this Court has previously upheld the admission of Dr. Coons's "future dangerousness" testimony in many cases, most recently in *Ramey v. State,* No. AP-75,678, 2009 Tex. Crim. App. Unpub. LEXIS 124, *44-45 (Tex. Crim. App. Feb. 11, 2009) (not designated for publication), and *Espada v. State*, No. AP-75,219, 2008 Tex. Crim. App. Unpub. LEXIS 806, *21-27 (Tex. Crim. App. Nov. 5, 2008) (not designated for publication). These cases are unpublished and therefore cannot be cited as precedent. At any rate, courts do not "grandfather in" expert testimony in a particular field or by a particular witness simply because the court has admitted expert testimony in that field or by that witness in the past. *See Hernandez*, 116 S.W.3d at 30 (fact that trial court may have admitted testimony from particular expert witness before does not mean that evidence is reliable in the particular case). Furthermore, each record and the *Daubert/Kelly* hearing of each record must be examined on its own merits. We cannot tell what the precise content of the *Daubert/Kelly* gatekeeping hearing, if any, was in these other cases, nor could we rely upon the content of such a hearing in another case in assessing the admissibility of Dr. Coons's testimony in this case, unless the former testimony were introduced at the current gatekeeping hearing.

[57]*See* Paul C. Gianelli, Daubert: *Interpreting the Federal Rules of Evidence*, 15 Cardozo L. Rev. 1999, 2001-03 (1994); *see Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319-20 (9th Cir. 1995) ("*Daubert II*") (if expert evidence is not based upon independent professional research outside of its possible litigation purposes, courts should look for "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles'"; this requirement may be met by "precisely [explaining] how [the experts] went about reaching their conclusions and point[ing] to some objective source–a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like–to show that they have followed the scientific method, as it practiced by (at least) a recognized minority of scientists in their field.").

[58] *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009) ("When expert testimony is involved, courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions.").

**C.     The Application of *Daubert/Kelly* and *Nenno* Principles in This Case.**

As the Seventh Circuit observed in *Rosen v. Ciba-Geigy Corp.*,[59] "under the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."[60]   Here, there is no question that Dr. Coons is a genuine forensic psychiatrist with a lengthy medical career, but the issue under Rule 702 is whether his "future dangerousness" testimony is based upon the scientific principles of forensic psychiatry.

From this record, we cannot tell what principles of forensic psychiatry Dr. Coons might have relied upon because he cited no books, articles, journals, or even other forensic psychiatrists who practice in this area.[61]   There is no objective source material in this record to substantiate Dr. Coons's methodology as one that is appropriate in the practice of forensic psychiatry.   He asserted that his testimony properly relied upon and utilized the principles involved in the field of psychiatry, but this is simply the *ipse dixit* of the witness.[62]   Dr. Coons

---

[59] 78 F.3d 316 (7th Cir. 1996).

[60] *Id.* at 318 (internal citation omitted).

[61] *See* Christopher Slobogin, *Dangerousness and Expertise*, 133 U. PA. L. REV. 97, 129 (1984) ("a clinician unfamiliar with the research literature on dangerousness prediction should not be considered qualified to offer a clinical prediction of dangerousness, regardless of her educational or experiential attainments.") (citing George W. Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics,* 5 AM. J. CRIM. L. 151, 175-77 (1977)).

[62] *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) ("Although expert opinion testimony often provides valuable evidence in a case, 'it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.'"); *Earle v.*

agreed that his methodology is idiosyncratic and one that he has developed and used on his

own for the past twenty to thirty years.  Although there is a significant body of literature

concerning the empirical accuracy of clinical predictions versus actuarial and risk assessment

predictions,[63] Dr. Coons did not cite or rely upon any of these studies and was unfamiliar

---

*Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

[63] As early as 1974, the American Association Task Force on Clinical Aspects of the Violent Individual published a report assembling the then-current knowledge concerning violent persons and the clinical issues they present, including the evaluation and prediction of violent behavior.  *See* AMERICAN PSYCHIATRIC ASSOCIATION TASK FORCE ON CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL, CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL (APA TASK FORCE REPORT NO. 8, 1974) (concluding that "the state of the art regarding predictions of violence is very unsatisfactory.  The ability of psychiatrists [to] . . . reliably predict future violence is unproved.").  In recent years, actuarial predictions, based upon statistically analyzed data, have taken on greater importance and achieved some professional acceptance in the field of predictions of future dangerousness, especially in the area of sexual offenders. *See generally* John Monahan, et. al., *A Jurisprudence of Risk Assessment: Forecasting Harm Among Prisoners, Predators, and Patients*, 92 VA. L. REV. 391 (2006) (discussing distinction between clinical and actuarial risk assessment which depends on actuarial instruments that measure risk of future violence); John Monahan, RETHINKING RISK ASSESSMENT: THE MACARTHUR STUDY OF MENTAL DISORDER AND VIOLENCE 7 (Oxford University Press 2001) (discussing the superiority of actuarial predictive methods to clinical predictive methods); William M. Grove et al., *Clinical Versus Mechanical Prediction: A Meta-Analysis,* 12 PSYCHOL. ASSESSMENT 19, 19 (2000) (finding that actuarial prediction techniques were, on average, ten percent more accurate than clinical predictions); Howard E. Barbaree et al., *Evaluating the Predictive Accuracy of Six Risk Assessment Instruments for Adult Sex Offenders,* 28 CRIM. JUST. & BEHAV. 490, 492 (2000) (discussing the accuracy of the Violence Risk Appraisal Guide at predicting recidivism by sex offenders); Mark Dolan and Mary Doyle, *Violence Risk Prediction: Clinical and Actuarial Measures and the Role of the Psychopathy Checklist*, 177 BRIT. J. PSYCH. 303, 305-09 (2000) (listing assessment instruments used for violence risk assessment in the mentally disordered and citing studies).

with the journal articles given to him by the prosecution.

Dr. Coons stated that he relies upon a specific set of factors: history of violence,[64] attitude toward violence, the crime itself, personality and general behavior, conscience, and where the person will be (i.e., the free community, prison, or death row).  These factors sound like common-sense ones that the jury would consider on its own,[65] but are they ones that the forensic psychiatric community accepts as valid?[66]  Have these factors been

---

[64] At least some psychiatric literature supports this factor as highly predictive of future violence.  *See* John W. Parry, et al., ABA COMM'N ON MENTAL HEALTH AND PHYSICAL DISABILITY LAW, NATIONAL BENCHBOOK ON PSYCHIATRIC AND PSYCHOLOGICAL EVIDENCE AND TESTIMONY 223 (1998) ("A history of past violence repeatedly has been shown to be one of the best predictors of violence."); Deidre Klassen & William A. O'Connor, *A Prospective Study of Predictors of Violence in Adult Male Mental Health Admissions*, 12 LAW & HUM. BEHAV. 143, 152 & tbl. 1 (1988) (finding that a recent history of violent crime associated strongly with post-release arrests in studies of men released from psychiatric hospitals).  These are the types of professional sources and studies that a psychiatric expert could reasonably cite as support for his methodology, and the proponent could offer them into evidence so that an appellate court could rely upon them.

[65] Indeed, some researchers have found that "laypersons and the clinicians had few differences of opinion" about assessments of future dangerousness, but neither had much accuracy.  Vernon L. Quinsey, et al., VIOLENT OFFENDERS: APPRAISING AND MANAGING RISK 62 (1998).

[66] In the early 1970s, one influential research clinician, Dr. Kozol, described the "dangerous" person as

> one who has actually inflicted or attempted to inflict serious physical injury on another person; harbors anger, hostility, and resentment; enjoys witnessing or inflicting suffering; lacks altruistic and compassionate concern for others; sees himself as a victim rather than as an aggressor; resents or rejects authority; is primarily concerned with his own satisfaction and with the relief of his own discomfort; is intolerant of frustration or delay of satisfaction; lacks control of his own impulses; has immature attitudes toward social responsibility; lacks insight into his own psychological structure; and distorts his perception of reality in accordance with his own wishes and needs.

Harry L. Kozol, Richard J. Boucher & Ralph F. Garofalo, *The Diagnosis and Treatment of Dangerousness,* 18 CRIME & DELINQ. 371, 379 (1972).  This description is not unlike that given

empirically validated as appropriate ones by forensic psychiatrists?  And have the predictions

based upon those factors been verified as accurate over time?[67]  Some of Dr. Coons's factors

have great intuitive appeal to jurors and judges,[68] but are they actually accurate predictors of

future behavior?  Dr. Coons forthrightly stated that "he does it his way" with his own

methodology and has never gone back to see whether his prior predictions of future

dangerousness have, in fact, been accurate.  Although he had interviewed appellant before

the first trial in 1990, Dr. Coons had lost his notes of that interview in a flood and apparently

had no independent memory of that interview.  He relied entirely upon the documentary

---

by Dr. Coons about appellant, and it may be a valid assessment of a person who would likely be "dangerous" in the future, but there is nothing in this record that shows Dr. Coons relied upon the principles and methodology of Dr. Kozol or his colleagues.

[67] "One study of capital murderers commuted as a result of the *Furman* decision found that 188 murderers were paroled by the end of 1987, serving an average of 5.3 years in the outside community.  Only one killed again, for a rate of .1% committing repeat homicides per year. Six of the 188 committed violent offenses, resulting in a violent recidivism rate of .6% per year." Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251, 1255 (2000) (citing James W. Marquart & Jonathan R. Sorensen, *A National Study of the Furman-Commuted Inmates: Assessing the Threat to Society from Capital Offenders*, 23 LOY. L.A. L. REV. 5, 24 (1989)).  One does not know whether any psychiatric expert predicted that some or all of these capital murderers would constitute a future danger.

[68] If these factors are not scientifically appropriate ones for predicting future violence, then their intuitive appeal is doubly dangerous as the jury might accept such testimony uncritically. *See Flores v. Johnson*, 210 F.3d 456, 465-66 (5th Cir. 2000) (Garza, J., concurring) ("[T]he problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an 'expert') gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact."); *see also* C. Robert Showalter & Richard J. Bonnie*, Psychiatrists and Capital Sentencing: Risks and Responsibilities in a Unique Legal Setting*, 12 BULL. AM. ACAD. PSYCH. L. 159, 165 (1984) (noting that because jurors are already likely to believe that a defendant poses a future danger of violence, they will tend to overvalue expert predictions that confirm those beliefs).

materials given to him by the prosecution, including his 1989 report. Dr. Coons, therefore, did not perform any psychiatric assessment of appellant after his eighteen years of nonviolent behavior on death row, nor did he refer to any psychological testing that might have occurred in that time frame.

Based upon the specific problems and omissions cited above, we conclude that the prosecution did not satisfy its burden of showing the scientific reliability of Dr. Coons's methodology for predicting future dangerousness by clear and convincing evidence during the *Daubert/Kelly* gatekeeping hearing in this particular case.[69] We conclude that the trial judge therefore abused his discretion in admitting Dr. Coons's testimony before the jury.[70]

**D.    Did Dr. Coons's Inadmissible Expert Testimony Affect Appellant's Substantial Rights to a Fair Sentencing Trial?**

---

[69] *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) ("Under Rule 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is proffering is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue."; proponent of expertise on eyewitness reliability offered nothing more than his own testimony at gatekeeping hearing); *see also Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("Thus, the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient.").

[70] *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) ("Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion."); *see also E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) ("Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.' Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702.") (quoting *Daubert*, 509 U.S. at 590; citing *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998).

Having found error in the admission of Dr. Coons's expert testimony, we must decide whether that error affected appellant's substantial rights to a fair sentencing trial.[71] A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[72] But if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless.[73] In making a harm analysis, we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence.[74] We consider overwhelming evidence supporting the particular issue to which the erroneously admitted evidence was directed–here, the "future dangerousness" special issue–but that is only one factor in our harm analysis.[75] It is the responsibility of the appellate court to assess

---

[71] TEX. R. APP. P. 44.2(b); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (applying TEX. R. APP. P. 44.2(b) to erroneously admitted hearsay documents to prove future dangerousness in sentencing phase of capital murder trial; error harmless); *see also Garcia v. State*, 126 S.W.3d 921, 927-28 (Tex. Crim. App. 2004) (in capital murder sentencing phase, erroneously admitted hearsay statements by murder victim– defendant's wife–that defendant had physically and psychologically abused her was harmless error given the considerable amount of other evidence from which the jury could have concluded that defendant had been abusive toward his wife and more than ample evidence to support the jury's answer to the "future danger" special issue).

[72] *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

[73] *See Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (a criminal conviction should not be reversed for non-constitutional error under TEX. R. APP. P. 44.2(b) if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect).

[74] *See Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Miles v. State*, 918 S.W.2d 511, 517 (Tex. Crim. App. 1996).

[75] *Motilla v. State,* 78 S.W.3d 352, 356-58 (Tex. Crim. App. 2002).

harm after reviewing the record, and the burden to demonstrate whether the appellant was harmed by a trial court error does not rest on either the appellant or the State.[76]

In his Brief, appellant cites articles that note the high persuasive value of "scientific" expert testimony, especially clinical psychological testimony concerning future danger-ousness.[77] Indeed, some studies have shown that juror reliance on an expert's credentials is directly proportional to the complexity of the information represented: the more complex the information, the more the jury looks to the background, experience, and status of the expert himself rather than to the content of his testimony.[78] There is also some evidence that jurors value medical expertise higher than other scientific expertise; thus, even when the information is identical, jurors find evidence from a doctor more persuasive than the very same testimony from a psychologist.[79] Furthermore, evidence that corresponds to firmly held

---

[76] *Johnson v. State,* 43 S.W.3d 1, 5 (Tex. Crim. App. 2001).

[77] *See* CHARLES T. MCCORMICK ET AL., MCCORMICK ON EVIDENCE § 203, at 608-09 (3d ed. 1984); John W. Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 OR. L. REV. 349, 361 n.81 (1992) ("There is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have particularly persuasive effect"); Daniel A. Krauss & Bruce D. Sales, *The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing*, 7 PSYCH. PUB. POL. & L. 267, 305 (2001) (clinical psychological expert testimony concerning future dangerousness in mock trial setting had strong effect on jurors).

[78] Joel Cooper et al., *Complex Scientific Testimony: How Do Jurors Make Decisions?*, 20 LAW & HUM. BEHAV. 379, 379 (1996).

[79] Jeff Greenberg & April Wursten*, The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence*, 19 PROF. PSYCH. RES. & PRAC. 373, 378 (1988).

beliefs may be particularly persuasive to jurors.[80] Thus, an expert's appeal to the juror's own common sense may be considerably more persuasive than a counterintuitive and complex, but empirically verified, theory.

These studies and articles would support a determination that the erroneous admission of a psychiatrist's unreliable testimony concerning the defendant's future dangerousness affects a substantial right to a fair sentencing hearing under Tex. R. App. P. 44.2(b). However, each case must be examined on its own facts, taking into account the specific evidence and the probable impact of the erroneously admitted expert evidence upon the jury's decisionmaking in the particular case.

In this case, there was ample evidence that there was a probability that appellant would commit future acts of violence quite apart from Dr. Coons's testimony. And, as noted above, it was some of that independent evidence that the jury requested to see during its deliberations. First, the psychiatric interview and evaluation done by Dr. Hodges more than twenty years before the offense and forty years before the trial reached the same basic conclusion as Dr. Coons did concerning appellant's character and his animosity toward women. Dr. Hodges's 1964 interview and clinical evaluation was completed long before any possible motive to view the facts and events of appellant's later life through any "future dangerousness" litigation prism had arisen. Expertise that is developed entirely independent

---

[80] *See* C. Robert Showalter & Richard J. Bonnie, *Psychiatrists and Capital Sentencing: Risks and Responsibilities in a Unique Legal Setting*, 12 BULL. AM. ACAD. PSYCH. & L. 159, 165 (1984) (noting that jurors tend to overvalue predictions that confirm their pre-existing beliefs).

of litigation by professionals acting in their normal field is more likely to be considered

reliable than expertise developed especially for trials.[81]    The same is true with the 1967

military medical report which noted appellant's "lifelong maladjustment" and his jealous

violent rage when he thought that his fiancée was having an affair with someone else.

Significantly, the jury asked to see these two reports during its deliberations; it did not ask

to see Dr. Coons's 1989 report.  We have often held that erroneously admitting evidence

"will not result in reversal when other such evidence was received without objection, either

before or after the complained-of ruling."[82]  Although neither Dr. Hodges nor the military

doctor specifically opined on whether there was a probability in 2008 that appellant would

---

[81] *See* FED. R. EVID. 702 advisory committee notes to 2000 amendments (noting that one factor courts have used both before and after *Daubert* in determining whether expert testimony is sufficiently reliable to be admitted is "Whether experts are 'proposing to testify to matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).  As the Ninth Circuit explained,

> That an expert testifies based on research he has conducted independent of the
> litigation provides important, objective proof that the research comports with the
> dictates of good science.  For one thing, experts whose findings flow from
> existing research are less likely to have been biased toward a particular conclusion
> by the promise of remuneration; when an expert prepares reports and findings
> before being hired as a witness, that record will limit the degree to which he can
> tailor his testimony to serve a party's interests. Then, too, independent research
> carries its own indicia of reliability, as it is conducted, so to speak, in the usual
> course of business and must normally satisfy a variety of standards to attract
> funding and institutional support.

*Id.* (internal citations omitted).

[82] *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.").

commit acts of future violence, their psychiatric and medical assessment of appellant's character for violence is remarkably similar to that of Dr. Coons.

Furthermore, Dr. Coons's testimony was rebutted and refuted by appellant's expert, Dr. Mark Cunningham, a forensic psychologist. Although Dr. Cunningham is not a medical doctor, he did win the 2005 Texas Psychology Association award for his outstanding contribution to science and, in 2006, he was awarded the American Psychological Association (APA) award for distinguished contributions to research in public policy. Both awards were for his research concerning factors that predict violence in prison and his research in capital sentencing. He is also among the 2,000-3,000 psychologists elected as a Fellow of the APA out of the 155,000 members. He has published a significant number of peer-reviewed studies and articles. He testified, with a PowerPoint slide presentation to illustrate,[83] about the violence risk assessment factors that he uses to assess the probability of future dangerousness in prison. His factors are based on research data from prisons, as well as other research and scholarly writings. He explained how his research is "scientific," replicable, and less subjective: "It's not based on my gut feeling about something. It's based on what the data tells me. And so, it's accurate. It's reliable."

After explaining the various studies, data, and statistical analysis, Dr. Cunningham

---

[83] His slides included statistical charts and numerous references to comprehensive scientific articles.

concluded that appellant fell within the lowest risk-of-violence category.[84] He criticized "the

hypothetical inference" mode of predicting future dangerousness as

> entirely speculative. . . . That's just blind guessing unless those factors have
> been demonstrated to be predictive of violence in prison. Critically important.
> . . . That's the problem with not knowing the literature, without knowing
> anything about the scientific studies that have been done in this area is then
> you have no idea whether the factors that you're looking at are predictive of
> anything or not.

According to Dr. Cunningham, if "what you're doing is basing it on your own gut and you

haven't done anything to check whether your gut reaction is correct or not, then your

accuracy level never improves."

He pointed to appellant's first trial as an example of the "tea-leaf-reader" school of

subjective clinical assessments.  In that trial, Dr. James Grigson,[85] who used the same

---

[84]  The American Psychiatric Association's 1974 Task Force report concluded,
Predictions of "dangerousness" are judgments of a "relative risk" sort, statements
of comparative probabilities that are usually quite low.  All that may be
reasonably concluded in most cases is that in the clinician's experience, and from
his knowledge of the literature, some persons are at a comparatively higher risk
for future violence than are others.
APA Task Force Report, *supra* note 63 at 31.  As Judge Johnson has noted in this same context,
A probability that a single individual will engage in a given behavior does not
exist. The probability that *does* exist is the likelihood that a person *like* that
individual will engage in a given behavior. . . . The proceedings in capital trials
are on much more stable ground if the future-dangerousness witnesses are
questioned about the probability of future violence by a person who is *like* the
defendant in, for example, background, criminal history, mental status, and
demonstrated propensity for violence against others.
*Allen v. State*,  No. AP-74,951, 2006 WL 1751227, *9 (Tex. Crim. App. June 28, 2006) (not
designated for publication) (Johnson, J., concurring).

[85] Dr. Grigson was nicknamed "Dr. Death" by the media and was one of the two
psychiatrists whose "future dangerousness" testimony was at issue in *Barefoot v. Estelle*, 463
U.S. 880 (1983); *see Mines v. State*, 852 S.W.2d 941, 949 (Tex. Crim. App. 1992).

subjective methodology as Dr. Coons, testified that, in his opinion, appellant posed *no* risk of future violence: "[H]e said, the ladies and gentlemen of the jury are more likely to kill somebody in the future" than appellant. Dr. Coons, using that very same methodology and facts concerning appellant, came to exactly the opposite conclusion.[86] Dr. Cunningham also told the jury that the major psychological associations had criticized Dr. Coons and his methodology as "unreliable and inconsistent with the standard of practice." In sum, Dr. Cunningham refuted Dr. Coon's expertise and the whole "tea-leaf-reader" notion of clinical psychiatric predictions of future dangerousness.

Furthermore, the prosecution did not rely heavily upon Dr. Coons's testimony during its closing arguments. Instead, the prosecutor emphasized his position that appellant was exactly the same person that he was when he killed Karen's parents and her brother back in 1989. He had not changed a bit.[87] The prosecutor then went on to recount evidence from the

---

[86] Dr. Cunningham concluded,
Both of those represent absurd unreliable conclusions based on a completely unreliable method. That's the benefit of using a subjective unreliable method is whatever case you go into you can say whatever you want, because it's based on reading tea leaves.

[87] The prosecutor's theory was that "[t]his is the same person 20 years later exactly. There is no difference." He explained,
The evidence in this case, the evidence presented to you from the witness stand here and testified to shows that he has no remorse. He had no remorse on August 29, 1989, when he individually killed three people and then kidnapped Karen Vicha and told her all about what he'd done. He had no sorrow in that at all. And he–he simply–he doesn't have it. It's not here. It's not within him. And what did he do later after the unspeakable horror that he inflicted on her? There was a hearing in this court ten years later and she was sitting out there in the audience. This man turned and was glaring at her, giving her an evil smile ten years later after slaughtering her family and giving her heartache that lasts for a life. He's

murders themselves and appellant's bragging to Karen afterwards.  The prosecutor then turned to the topic of predicting future dangerousness:

> Can we predict a person's future?  Well, we absolutely can.  You heard what Dr. Hodges said.  He made an analysis of it.  He talked about how he had a dislike of women, how he had a low opinion of them.  Did he?  His conduct was absolutely borne out.  And Dr. Hodges said the prognosis is poor, and it was, because this person ultimately cares only about himself.

He then recounted how Bobby's fellow officer had predicted that appellant would commit some violent act after he had been arrested for kidnapping Karen before the murders.  He then turned briefly to Dr. Coons:

> Dr. Coons examined–first he talked to [appellant] personally before the first trial in 1990.  He interviewed him, then he gave his assessment of him. And the assessment is–sure, you deal with medical predictions and the training of psychiatrists–but it's just common sense.  If you don't have a conscience and you've committed dangerous violent acts and you've shown that you have no regard for human beings in any form unless it's something that serves you, of course, there's a probability that you will commit criminal acts of violence.

The prosecutor then referred to appellant's expert psychologist, Dr. Cunningham, and how

---

grinning at her.  Is that any remorse?  Ten years later he's the same person that did the killing.

And then in the courtroom during the trial last week, she told you that when she–after she burst into tears and was sobbing and looked at him, as you saw her do, he gave her the same smile.  I got you.  I hurt you.  Folks, this is the same man that committed those murders.

What's another thing we can prove?  He has the same unnatural attachment to young girls that he did when he was out in the free world molesting them.  You've heard that testimony.  You've heard what he did.  There's no questioning the evidence about that.  And so now, what does he do in his jail cell? He's got pictures of–not pinups of 30-year-old women from Playboy.  He's got pictures of young girls in various gymnast positions.  He is the same person that was a molester and a murderer back on August 29, 1989.

he had called Karen biased for saying that appellant twice gave her an evil grin in two

different court appearances.  The prosecutor then returned to his theme of appellant's lack

of conscience and how he had simply been restrained, not changed, in prison.

The defense, in its closing argument, quickly focused on the future dangerousness

issue as well.  Counsel argued that the statistical evidence that Dr. Cunningham had

presented made it very difficult for the prosecution to prove that appellant would commit

future acts of violence.  He compared the two experts:

> I want to talk about Dr. Coons versus Dr. Cunningham, because it really does
> sort of come down to Dr. Coons versus Dr. Cunningham.  Dr. Coons is a
> likable guy.  Dr. Coons does an excellent job of testifying.  He seems to have
> a lot of horse sense.  Okay.  He seems to have a lot of common sense.  That's
> totally true.  Dr. Cunningham is extremely long-winded.  Okay.  He has a hard
> time sort of answering a question directly.  I recognize those facts.  But that's
> because he is a scientist.[88]  All right.  And Dr. Cunningham talked about being
> a scientist and what that means.  What that means is, I don't just look at the
> evidence and make a wild guess.  Okay.  I'm not a tea-leaf reader.  I'm not a
> guy who says, well, I'm just going to depend on my–my experience and say
> this person is a future danger–okay–without going back and checking my
> work, without quantifying things, without being able to say, you know, I'm
> correct to this certain quantum of correctness. . . . So he's a scientist.  A
> scientist comes up with an idea, a theory.  Okay.  He tests that theory.  He
> doesn't just test the theory, but he also gives his data to other scientists to look
> at, so they can test his theory.  Then he goes back and double-checks his work.
> Then he thinks, now, maybe there's a weakness in my own argument that I've
> already made.  Let's go back and double-check that weakness and see it that
> changes our numbers or does that reinforce our numbers.  All right.  So that's
> what a scientist is supposed to do.
> Do you remember Dr. Coons's testimony?  Dr. Coons, do you check

---

[88] Defense counsel had already explained why he had called Dr. Cunningham: "Because Dr. Cunningham is the leading scientist in this field.  All right.  Out of every scientist who is looking at these numbers, out of every scientist who is studying this issue, he's the leading guy."

your work? Not really.  Dr. Coons, do you remember going back and looking at the records of people that you have predicted are going to be a future danger to see if they really were?  Well, I'm sure I've done it, but I can't tell you who I've done it with.  In other words, he's a guy who is completely uninterested in whether he's correct or not. . . .

. . . How can he ever get better?  How can he establish for the jury that his opinion is reliable?  He can't because he's not a scientist.  He's a tea-leaf reader.

The defense then recapped Dr. Cunningham's testimony which had been that appellant posed an extremely low risk of committing future acts of violence because (1) he is well-adjusted to institutional life; (2) he is sixty years old and thus has "aged out" of his violent years; (3) he has performed many positive acts and developed a positive attitude toward fellow inmates; (4) he is serving a very long sentence and "40 years of tests" show that long-term inmates are statistically less likely to commit acts of aggression than are "short-termers;" (5) he has a GED and additional work certificates; and (6) he has continuing family ties to the community.  All of these factors are supported by "the numbers that exist in reality.  These are the official numbers.  So he's not making up the numbers.  He's a scientist.  He's just reporting what the data is."  The defense concluded its discussion of "future dangerousness," with the statement that "Dr. Cunningham's conclusions are very appropriate and very reasonable and scientific and provable as opposed to Dr. Coons's conclusions, which are nonscientific and not provable.  Okay.  And even if they were provable, he hasn't bothered to go out and try to prove them."  Counsel then moved on to the mitigation issue and appellant's miserable childhood and youth.

During his final argument, the prosecutor mentioned Dr. Coons very briefly by

reminding the jury that another psychiatrist, Dr. Hodges, had talked to appellant back in 1964 and "he looked at him and listened to his answers" and reached the conclusion that appellant was "extremely hostile to women, very low opinion of women, has poor control, very low self-esteem.  Projects a great deal of responsibility for his own actions on other people.  It was Karen's fault that she got kidnapped.  It was Karen's fault because she stood up to him.  And it ruined his life.  So it was her fault.  And he had to extract revenge on her and he did it in the most brutal, the most selfish way he possibly could."  The prosecutor then referred to the military doctor's assessment from 1967, with both doctors reaching the "same common sense assessment" of appellant.

Based upon the complete record of this case, we find that the error in admitting Dr. Coons's testimony did not affect appellant's substantial right to a fair sentencing hearing because

(1)    There was ample other evidence supporting a finding that there was a probability that appellant would commit future acts of violence;[89]

---

[89] *See Motilla v. State*, 78 S.W.3d 352, 356-57 (Tex. Crim. App. 2002) (reiterating that "overwhelming evidence" of guilt is one consideration in deciding whether improper admission of evidence was harmful in a particular case); *Sanne v. State*, 609 S.W.2d 762, 773-74 (Tex. Crim. App. 1980) (erroneous admission of expert opinion testimony by forensic pathologist concerning "future dangerousness" in capital murder trial was harmless even under constitutional harmless error rule because there was ample evidence of defendant's prior criminal acts of violence and facts of capital murder; other evidence demonstrated defendant's "antisocial personality" and thus "the minds of an average jury would not have found the State's case (on the second punishment issue) less persuasive" had witness's testimony been excluded) (internal quotation marks omitted);  *Redmon v. State*, 828 P.2d 395, 400 (Nev. 1992) (erroneous admission of "highly unreliable" psychiatric evidence of "future dangerousness" in capital murder trial was harmless because record contained "plentiful other evidence from which [the factfinder] could reasonably infer appellant's future dangerousness"), *overruled on other grounds by Alford v. State*, 906 P.2d 714 (Nev. 1995).

(2) The same basic psychiatric evidence of appellant's character for violence was admissible and admitted, without objection, through other, entirely objective, independent medical sources–the reports by Dr. Hodges and the military doctor years before appellant committed these murders;[90]

(3) Dr. Coons's opinion was not particularly powerful, certain, or strong;[91] his opinion, coming after an extremely long and convoluted hypothetical was simply that "there is a probability that" appellant would be a continuing threat to society by committing criminal acts of violence;

(4) Dr. Coons's testimony was effectively rebutted and refuted by Dr. Cunningham, who not only relied upon specifically listed scientific materials and data during his testimony, but who also noted that Dr. Coons and his methodology had been criticized by both the American and Texas Psychological Associations; and

(5) The State barely mentioned Dr. Coons during closing argument and did not emphasize him or his opinions.

Given these particular circumstances, we conclude that the error in admitting Dr. Coons's testimony did not have a "substantial and injurious" effect upon the jury's deliberations concerning the future dangerousness special issue.[92] We therefore overrule points of error

---

[90] *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

[91] *Compare Cook v. State*, 821 S.W.2d 600, 602 (Tex. Crim. App. 1991) (given its strength and character, admission of psychiatrist's testimony was harmful error; expert (1) testified that defendant had "an antisocial personality disorder termed sociopath"; (2) opined that defendant "certainly will, from a medical psychiatric standpoint probability, continue to behave and act in a way that does represent a very serious threat to the people within our society"; and (3) concluded that defendant would be an "'extremely severe'" threat to others: "'You can't come any more severe than that. If I had the least doubt, if I had any question in my mind, I certainly would not mind telling you that. I feel absolutely one hundred percent certain that he is and will continue to be a threat no matter where he is.'").

[92] *See King v. State*, 953 S.W.2d 266, 271-73 (Tex. Crim. App. 1997) (harmless error in erroneous admission of hearsay disciplinary reports; reports "did not have a substantial or injurious influence on the jury's decision" concerning future dangerousness special issue because (1) properly admitted evidence showed an escalating pattern of disregard for the law; (2) the

three, four, and five.

## The Admissibility of A.P. Merillat's Testimony

In his sixth point of error, appellant claims that the trial court erred in admitting the testimony of A.P. Merillat, an investigator for the Special Prosecution Unit, about the Texas prison classification system and violence in prison.  Appellant argues that: (1) Mr. Merillat's testimony was irrelevant as it did not relate to appellant personally, and (2) this witness testified to information that was already common knowledge among jurors.  The State argues that Mr. Merillat's rebuttal testimony was relevant to refute Dr. Cunningham's statistical data and to impeach the accuracy of his "low risk" future dangerousness prediction.[93]  We agree that Mr. Merillat's testimony was admissible as rebuttal "educator-expert" evidence.

On voir dire, Mr. Merillat stated that his testimony is based on his specialized knowledge of Texas prisons and prison violence during his nineteen years as a criminal investigator with the Special Prosecution Unit.  He proposed to testify concerning the under-reporting of prison violence in official data compilations, the prison classification system, and the opportunities for violence inside prison.

The trial judge allowed Mr. Merillat's testimony, although he granted appellant's motion in limine to avoid mention of any specific instances of misconduct by other inmates

---

offense itself was particularly brutal; (3) after the murder, the defendant bragged that he would kill again; and (4) the State did not emphasize the documents during closing argument).

[93] In the trial court, the State noted, "We have all of these statistics that Dr. Cunningham relied upon and we have a right to show that there's a substantial reason to believe that they may be inaccurate."

except for one anecdote concerning an inmate's forced starvation death which served as "a great example for underreporting of violence."

Mr. Merillat then testified before the jury about the inmate classification system and the under-reporting of violence in prison. He also described administrative segregation and how it is used as "punitive housing" for recalcitrant inmates. Mr. Merillat explained why the official prison statistics used by Dr. Cunningham are not completely reliable: (1) the prison reporting system does not match the penal code definitions of "violent" behavior;[94] and (2) not all incidents of inmate-on-inmate incidents of violence are reported. Finally, he told the jury that, in the last few years, his unit had prosecuted 94 inmates who were serving life sentences for capital murder for both assaultive and non-assaultive felonies.

On cross-examination, Mr. Merillat agreed that he knew nothing about appellant except that his office had never prosecuted him. He agreed that he was not qualified to express any opinion regarding appellant's "future dangerousness." He also explained how death row inmates "had the run of the row" and could work in the garment factory when death row was in the Ellis Unit. Mr. Merillat agreed that the point of his testimony was that there are abundant opportunities for inmates to be either violent or good, depending upon their own decisions.

---

[94] For example, Mr. Merillat said that the official TDCJ statistics define serious assaults on staff as only those that result in injuries requiring more than first aid. Thus, while the official prison data showed 78 serious assaults on staff for 2007, the Special Prosecution Unit prosecuted 197 assaults against prison staff members. Similarly, there is no official prison data entry for homicides of prison guards in the line of duty because it is not an inmate death.

Appellant asserts that the primary subject of Mr. Merillat's testimony–opportunities for violence in prison–is within the common knowledge of the jurors.  Indeed, most jurors probably have some understanding that violence can and does occur in prison, but a trial court need not exclude expert testimony when the general subject matter is within the comprehension of the average juror, as long as the witness has some specialized knowledge on the topic that  will "assist" the jury.[95]  It is only when the expert offers no appreciable aid that his testimony fails to meet the Rule 702 standard.[96]  The question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way.

In this case, Mr. Merillat confined his testimony to specific information about the operations of the Texas prison system and the opportunities for violence or productive behavior.  His expert testimony was intended to (1) educate the jury about an area in which it lacked a thorough understanding;[97] and (2) cast doubt upon the official prison data that Dr.

---

[95] *See Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990) (under Rule 702, if "specialized knowledge will assist the jury to understand the evidence or will assist them to determine a fact in issue, an expert may be allowed to provide the jury with the benefit of that knowledge. Two themes are prevalent within the language of the rule. First, the jury must not be qualified to intelligently and to the best possible degree determine the particular issue without benefit of the expert witness' specialized knowledge.  Second, the clear meaning of the rule must be observed. . . . The use of expert testimony must be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror.") (internal citation omitted).

[96] *See, e.g., Pierce v. State*, 777 S.W.2d 399, 414 (Tex. Crim. App. 1989).

[97] *See, e.g., Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) (defense expert should have been allowed to testify about why a woman who was physically and sexually abused would continue to stay with an abusive husband because the "average lay person has no basis for

Cunningham relied upon.  Mr. Merillat acted "as an advisor to the jury, much like a consultant might advise a business[.]"[98]  Because Mr. Merillat's testimony was educator-expertise information designed to "assist" the jury under Rule 702, the trial judge did not abuse his discretion in admitting it.  Point of error six is overruled.

In point of error seven, appellant contends that the trial court erred by allowing Mr. Merillat to testify to hearsay information in violation of the Confrontation Clause[99] and of the Texas Rules of Evidence.  Out of six instances in which appellant claims that Mr. Merillat testified to hearsay information, we have found only three trial objections based on hearsay or the Confrontation Clause.  We will address only those three instances:

(1)    Appellant objected on the basis of hearsay to Mr. Merillat's statement that 78 serious staff assaults were documented in the official prison report that Dr. Cunningham had used as the basis for his statistical analysis;

(2)    Appellant objected on the basis of hearsay and the Confrontation Clause to Mr. Merillat's explanation of why inmate-on-inmate violence is under-reported– nobody wants to be a "snitch" which is the "very lowest form of life in the penitentiary"; and

___

understanding the conduct of a woman who endures an abusive relationship"); *see also* FED. R. EVID. 702 advisory committee note ("Most of the literature assumes that experts testify only in the form of opinions.  The assumption is logically unfounded.  The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.").

[98]    2 STEPHEN SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 1250 (7th ed. 1998).

[99] Appellant's Confrontation Clause objection is based on his assertion that Mr. Merillat's testimony involved "testimonial hearsay" statements.  *See Crawford v. Washington*, 541 U.S. 36, 51 (2004).  If the testimony did not involve hearsay, it ineluctably follows that it did not involve "testimonial hearsay."

(3)    Appellant objected on the basis of hearsay and an inability to confront and cross-examine when Mr. Merillat cited the story of an inmate who had been beaten and starved to death by his stronger, gang-member cellmate, as an example of why and when fellow inmates fail to report acts of violence.

The trial judge properly overruled these three hearsay and confrontation objections.

Hearsay is an out-of-court statement by a person offered for the truth of the matter asserted.[100]  None of these three pieces of testimony fits that definition.  In the first, Mr. Merillat was not offering his statement of the official prison data compilation of "78 serious staff assaults" for the truth of the matter asserted–that there were 78 serious staff assaults in the previous year.  Quite the reverse.  Mr. Merillat's point was that the official number of 78 was significantly lower than the actual number of serious assaults and thus the official prison statistics that Dr. Cunningham used as the basis for his expert opinion were inaccurate.[101]  In the second, the testimony concerning why assaults upon inmates aren't reported "because by telling on the person who did it, they are going to be much worse off[,]" Mr. Merillat did not disclose any out-of-court statement.[102]  He was simply explaining, as a general proposition, why inmates do not "snitch" on each other.  In the third,  the inmate who was beaten and starved to death, appellant does not point to any out-of-court statement.  There

---

[100]  EX. R. EVID. 801(d).

[101] *See, e.g., Bell v. State*, 877 S.W.2d 21, 24 (Tex. App.–Dallas 1994, pet. ref'd) ("If the out-of-court statement is relevant only if the trier of fact believes that the statement was both truthful and accurate, then the statement is hearsay.  If the relevancy of the statement does not hinge on the truthfulness of the statement, it is not hearsay.").

[102] Appellant's objection would have merit if Mr. Merillat had testified, "Cool Hand Luke told me that he would never be a snitch for Dragline."

is none.  Mr. Merillat was recounting an  event, not a verbal or written statement.  He may

have first heard of the event by someone telling him of it,[103] but he did not recite or  imply

any out-of-court statements.[104]   Because the trial judge did not abuse his discretion in

overruling appellant's hearsay and confrontation objections, we overrule point of error seven.

In his eighth point of error, appellant asserts that Mr. Merillat's testimony was

inadmissible because of the Eighth Amendment's "heightened reliability" requirement in

capital murder prosecutions.   Appellant fails to cite any authority for increasing the

admissibility requirements for evidence in a capital murder sentencing trial.  Indeed, some

state and federal courts have suggested that the Confrontation Clause, the Rules of Evidence,

and the rule against hearsay do not apply with full force in capital murder sentencing trials.[105]

---

[103] Mr. Merillat testified, however, that he investigated this case and "worked the trial of the person responsible" for the prison death, so he would have first-hand knowledge of at least the events that he briefly described.

[104] When appellant objected that "the gruesome details of how some other individual tortured some other individual has nothing to do with the jury's decision here," presumably invoking Rules 401-403, the trial judge sustained his objection, and the prosecutor moved on.

[105] *See United States v. Fields*, 483 F.3d 313, 332 (5th Cir. 2007) ("Here we are asked to decide whether the confrontation right applies with full force throughout capital sentencing, despite the fact that it is nonexistent at ordinary sentencing. Given that, as shown above, no other Sixth Amendment right has been applied (*vel non*) differently at capital sentencing from how it is applied at noncapital sentencing, there is little reason to establish divergent rules with regard to the confrontation right when the sentencing authority is selecting a sentence from within an authorized range.  On the basis of the Supreme Court's consistent treatment of Sixth Amendment rights across capital and noncapital cases alone, we find unpersuasive the dissent's textual argument for why the Confrontation Clause should extend through the entirety of the capital sentencing process, in light of the fact that the jury right extends only as far as the eligibility determination."), *cert. denied*, 522 U.S. 1144 (2008); *see also United States v. Johnson*, 378 F. Supp. 2d 1051, 1059-62 (N.D. Iowa 2005) (questioning whether the Confrontation Clause applies in capital sentencing phase); *State v. Johnson*, 284 S.W.3d 561, 583-84 (Mo. 2009) (no

We express no opinion on that matter, but we reject appellant's Eighth Amendment claim

and therefore overrule point of error eight.

## Emotional Outbursts by Two Witnesses

In points of error nine and ten, appellant claims that the trial court erred in denying

his motion for a mistrial when Karen Vicha and Lorna Sawyer made separate emotional

outbursts during the punishment trial.  In each case, the trial judge sustained appellant's

objection to the outburst and instructed the jury to disregard the remarks.  We conclude that

the trial court did not abuse his discretion in these rulings.

During Karen Vicha's testimony describing what appellant told her about how he had

chased and shot her brother, she explained that

> [Appellant] started talking about–he told me, you're pretty tough, you put up
> a good fight with that gun.  And he said, your brother thought–he said, your
> brother thought he was tough too.  He said, all cops think they're tough, but he
> thought he was really tough.  He said–he said–he told me he said, all I was
> trying to do was keep you away from my sister.  And he said, I finally had to
> shut him up and blow a hole that big in his neck.

At that point, Karen broke down crying and said, "And I hate you for making me go through

---

abuse of discretion to admit written victim impact statement in capital murder sentencing trial
over hearsay and confrontation objections).  In *Fields*, the Fifth Circuit explained that in
*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976),

> The [Supreme] Court explained that the need for greater reliability in the selection
>
> of an appropriate punishment entails *not* stricter evidentiary rules, but the
> assurance of "individualized sentencing" once a defendant is eligible for the
> death penalty.

*Fields*, 483 F.3d at 336.

this again and my kids.  You're mean."  The trial judge immediately called a recess.[106]  When

the jury returned, the trial judge instructed them: "Ladies and gentlemen of the jury, at this

time I am going to give you an instruction to disregard the last comment of the witness and

not consider it for any purpose whatsoever."  He denied appellant's motion for mistrial, and

the prosecutor continued with his questions.

After six more witnesses had testified, the State called Lorna Sawyer, appellant's

cousin.  As soon as she had been sworn in, but before any questioning, she burst out, "Evil

piece of shit."  The defense immediately responded: "Judge we object.  Call for a mistrial.

Request an instruction to disregard.  Call for a mistrial."  The Judge said, "I'll instruct the

jury to disregard the last comment of the witness," and Ms. Sawyer said, "Sorry."  When

appellant then requested that she be excluded as a witness, the trial judge took a recess.[107]

---

[106] While the jury was out, defense counsel explained what had happened:
    We would like to note for the record that the last comment of the witness
    was–was made with the witness in a very tearful state.  What the witness did was
    to turn in her chair, look directly at [appellant] and say something along the lines
    of, I hate you for making me go through this.  That was an unsolicited comment
    not made in response to any of the Government's questions.  So at this time, we
    would ask the Court to rule that's an inadmissible statement and not relevant and
    unfairly prejudicial and we would like to ask the Court to instruct the jury to dis–
    disregard the last remark.
The prosecutor agreed that, although it was "spontaneous," and "in response to the emotion of
the moment," it would be appropriate to instruct the jury.  The defense then asked for a mistrial,
based on Rule 403, the Fifth Amendment, Sixth Amendment and the Eighth Amendment.

[107] During the recess, appellant reiterated his objection under Rule 403 and stated, "I think
it's completely poisoned the jury, this display of emotion, something that not even the–the
complainants–you know, the Vicha family did, I think the jury's going to be unfairly influenced
by that to the point that [appellant] now can't get a fair trial."  The record reflects that the witness
then made a laughing sound.  The trial judge said that he would instruct the jury to disregard the
comment, and he admonished the witness to answer only the questions that are asked and to "not

When the jury returned, Ms. Sawyer testified that appellant offered her a job at a drive-in theater when she was 16. She had worked there for about two and a half weeks when appellant picked her up for work, but he took her to his house and raped her instead. She was so scared that she had never told anyone, except her sister, about this experience. When the prosecutor asked Ms. Sawyer if she was still afraid of appellant, the following occurred:

Witness:     Actually, uh, without being ugly, I'd like to go there and just knock the shit out of him.

Defense:     Judge, I'm, going to have to object, Your Honor. I think that was an inappropriate comment.

Witness:     It is not inappropriate.

Defense:     I'd object to the sidebar from the witness. Judge. I'd ask that–the jury to disregard.

Court:     The jury is instructed to disregard the last comment of the witness and not consider it for any purpose.

Defense:     I'd ask for a mistrial, You Honor.

Court:     That's denied.

State:     Lorna–

Witness:     I'm sorry, I'm sorry.

And the testimony then continued.

Appellant argues that these outbursts, individually or collectively, unfairly influenced the jury and that influence could not be limited by an instruction to disregard.

_____

make any voluntary statements."

A trial judge's denial of a motion for mistrial is reviewed under an abuse of discretion standard,[108] and his ruling must be upheld if it was within the zone of reasonable disagreement.[109] We have held that an outburst from a bystander or witness "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability [exists] that the conduct interfered with the jury's verdict."[110] In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions.[111]

Appellant relies upon *Stahl v. State*[112] for his claim that the judge's instruction to disregard the spontaneous outbursts could not have cured their prejudicial effect and those outbursts must have interfered with the jury's verdict. But *Stahl* was decided upon the basis of prosecutorial misconduct, not merely the witness's emotional outburst. In *Stahl,* the

---

[108] *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

[109] *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

[110] *Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988) (internal quotation marks omitted) (quoting *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985)).

[111] *Gamboa*, 296 S.W.3d at 580; (capital murder defendant not entitled to a mistrial based on an outburst by the victim's family member, shouting "You did this for 200 dollars?", during the testimony of a prosecution witness); *Brown v. State*, 92 S.W.3d 655, 661 (Tex. App.–Dallas 2002) (victim's father's outburst of "Give my son justice, please[,]" during murder trial cured by trial judge's instructions to disregard his comment), *aff'd on other grounds*, 122 S.W.3d 794 (Tex. Crim. App. 2003); *Matthews v. State*, 960 S.W.2d 750, 757 (Tex. App.–Tyler 1997, no pet.) (outburst by manslaughter victim's brother contradicting defense attorney's question about whether the victim's car stereo was on was cured by the judge's instruction to disregard).

[112] 749 S.W.2d 826 (Tex. Crim. App. 1988).

prosecutor called the victim's mother to the stand, knowing that she was prone to emotional outbursts, and asked her to identify a photograph of her dead son.[113] She burst into tears and yelled, "Oh, my god. My baby. My God. . . . May he rest in hell. May he burn in hell. Oh, my baby."[114] The judge instructed the jury to disregard, but the prosecutor "exacerbated" the impact by repeatedly referring to the incident in closing argument.[115] The prosecutor's "deliberate" and "persistent" conduct, "in direct contravention of prior rulings by the judge" indicated "a desire to impermissibly sway the jury."[116] Indeed, the court of appeals had suggested that the *Stahl* prosecutor "actually orchestrated the original outburst."[117]

In this case, however, there is no suggestion that the prosecutor anticipated the short emotional outburst by Ms. Vicha in the middle of her lengthy testimony or the entirely inappropriate start of Ms. Sawyer's testimony. In the first instance, the prosecutor agreed with the correctness of an instruction to disregard and, in the second, he did not attempt to justify Ms. Sawyer's outburst.[118] The trial judge immediately instructed the jury to disregard

---

[113] *Id.* at 828.

[114] *Id.* at 828-29.

[115] *Id.* at 830 ("The persistent appeals in the face of adverse rulings speak loudly of the prosecutor's desire to use the outburst for inflammatory purposes.").

[116] *Id.* at 830-31.

[117] *Id.* at 826-27.

[118] Ms. Sawyer could charitably be called a "feisty" witness, and both the prosecutor and defense had difficulty controlling her nonresponsive answers. She was quickly excused.

those outbursts, and we must presume that the jurors followed these instructions.[119]  The prosecution did not refer to, or attempt to capitalize upon, the outbursts during closing arguments.  Furthermore, they occurred during the sentencing stage of a capital murder trial, not the guilt stage as in *Stahl*.  At the punishment hearing, evidence of the defendant's character is both relevant and admissible as is the opinion testimony concerning good or bad character traits by those who know him.[120]  Obviously, character evidence must be offered in a proper form and be responsive to specific questions, so these outbursts were not proper, but their potential for  prejudice was less than had they occurred during the guilt phase of a trial.

Because we conclude that nothing in the record suggests that the outbursts were of such a nature that the jury could not follow the trial judge's instructions to disregard them,[121] we overrule appellant's points of error nine and ten.

### The Admission of the Hearsay Statement by a Witness's Sister

In his eleventh point of error, appellant claims that the trial judge erred in admitting Amy Zuniga's testimony that her sister, Karen, told her that appellant was looking in her bedroom window as she was dressing.  Appellant objected to hearsay, but the trial judge

---

[119] *See Gamboa*, 296 S.W.3d at 580.

[120]  *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1); *see also Martinez v. State*, 924 S.W.2d 693, 696 n.6 (Tex. Crim. App. 1996); *Jones v. State*, 944 S.W.2d 642, 652-53 (Tex. Crim. App. 1996).

[121] *See Gamboa*, 296 S.W.3d at 580.

admitted Amy's testimony as both an excited utterance and a present sense impression.  We conclude that the trial judge did not abuse his discretion in finding that Karen's out-of-court statement was admissible as an excited utterance exception to the hearsay rule.[122]

Amy Zuniga testified that appellant was her uncle and, when she was young, she thought he was a model of how a parent should be because he was so nice to his own son.  However, Amy changed her mind about appellant when she was fifteen.  She explained that one day she was sitting in a rocking chair in her nightgown, when appellant came in and pulled her legs apart; then he made "a vulgar display like he was licking me" between her legs.  After that, she avoided him.  But right before appellant moved into Amy's mother's home shortly before the murders, Amy came out of the shower and was changing her clothes in her bedroom when she heard a "commotion from the kitchen, a beating on the window."  Then Karen ran through Amy's bedroom door from the kitchen, went outside through her back bedroom door, and started yelling.  Amy peeked out through the curtains and saw appellant driving off in his truck.  Then Karen came back inside, "very mad and frustrated.  She was red, angry."  Karen told Amy that she had seen appellant outside looking through the curtains as Amy was dressing.

The trial judge admitted Karen's out-of-court statement to Amy based on it being both an excited utterance and a present sense impression.  We need examine its admissibility only under the excited utterance exception.  An excited utterance is a statement that relates to a

---

[122]    EX. R. EVID. 803(2).

startling event or condition, and it is made when the declarant is still under the stress of excitement caused by the event or condition.[123]

Appellant contends that Karen's statement was not admissible as an excited utterance because there was no showing that she was in the "grip of violent emotion, excitement or pain."[124] She was angry, not excited. The critical question, however, is not the specific type of emotion that the declarant is dominated by–anger, fear, happiness–but whether the declarant was still dominated by the emotion caused by the startling event when she spoke.[125] Appellant also argues that Karen's statement was not admissible because there was no independent evidence of the startling event–appellant's "Peeping Tom" conduct. Appellant cites to a Texas Supreme Court case, *Richardson v. Green,*[126] which applied the common-law "res gestae" rule. But Rule 803(2) changed the common law; the current rule does not require independent evidence of the exciting event before the trial judge may admit the

---

[123] *Id.*; *see McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008); *Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003).

[124] *King v. State*, 631 S.W.2d 486, 491 (Tex. Crim. App. 1982).

[125] *Zuliani*, 97 S.W.3d at 596; *see also Apolinar v. State*, 155 S.W.3d 184, 190 (Tex. Crim. App. 2005) (declarant was "animated, angry, and excited" when he made statement about aggravated assault); *see also United States v. Jennings*, 496 F.3d 344, 348-49 (4th Cir. 2007) (statements by 13-year-old airline passenger who was "shocked, angry, and confused" by defendant-passenger's groping of her inner thigh were admissible under FED. R. EVID. 803(2)), *cert. denied*, 552 U.S. 1214 (2008).

[126] 677 S.W.2d 497, 500 (Tex. 1984) ("To be admissible as res gestae a statement must be shown to have been a spontaneous reaction to an exciting event, and there must be independent proof of the occurrence to which the statements relate; the statements themselves cannot be used to prove the exciting event.").

declarant's statements relating to that event.[127]  The trial judge decides, under Rule 104(a),

whether there is sufficient evidence to prove an exciting event, and he may consider the

statement itself in making that decision.[128]  Here, for example, the trial judge could consider

the evidence that Amy said that she (1) heard her sister banging on the kitchen window, (2)

saw Karen run through her bedroom and out the door, and (3) saw appellant driving off just

before Karen returned to tell her that appellant was peeping in her bedroom window.  That

evidence, when combined with Karen's statement, would support a finding of the startling

event–appellant's "Peeping Tom" conduct.[129]

Because we conclude that the trial court did not abuse his discretion in admitting

Karen's excited utterance, we overrule appellant's eleventh point of error.

**Miscellaneous Claims**

**A.    Limitation of Voir Dire Questions**

---

[127] *See* 2 STEVEN GOODE, OLIN GUY WELLBORN, III, & M. MICHAEL SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 803.3, at 132-33 (2d ed. 1993) (stating that Rule 803(2) overturns prior Texas law on the need for independent evidence of the startling event); DAVID A. SCHLUETER & ROBERT R. BARTON, TEXAS RULES OF EVIDENCE MANUAL § 803.02[3][d], at 852-53 (8th ed. 2009); *see also* FED. R. EVID. 803(2), advisory committee note; Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 436, at 405-06 (2d ed. 1994).

[128] *See United States v. Moore*, 791 F.2d 566, 570-71 & n.1 (7th Cir. 1986) (stating that the "appearance, behavior and condition of the declarant may establish that a startling event occurred.  Further, the declaration itself may establish that a startling event occurred.") (citations omitted); *see also United States v. Brown*, 254 F.3d 454, 459-60 (3d Cir. 2001) (collecting cases and scholarly authority to support its conclusion that "an excited utterance may itself be sufficient to establish that a startling event occurred and that the question whether corroborating evidence independent of the declaration is needed in a given case to establish the occurrence of such an event is committed to the discretion of the trial judge.").

[129] *See Moore*, 791 F.2d at 570-71 & n.1.

In his twelfth point of error, appellant claims that the trial court erred in limiting his voir dire by refusing to allow him to question the jurors about the mitigation value of specific facts, including evidence of a troubled childhood, mental illness or extreme emotional distress, community service, age, kindness to others, work ethic, or military service. The State objected, citing *Standefer v. State*,[130] *Sells v. State*,[131] and *Wingo v. State*,[132] and stated that these were commitment questions. The trial judge sustained the State's objections, but allowed more general mitigation questions about whether there was anything that the jurors "could consider under the circumstances of having found [appellant] a future danger to society which might merit a life penalty."

In *Raby v. State*, we rejected appellant's claim that he is entitled to ask potential jurors in a death penalty case about what specific evidence that juror could or would consider as mitigating.[133] We stated that "[a] trial court does not abuse its discretion by refusing to allow a defendant to ask venire members questions based on facts peculiar to the case on trial (e.g. questions about particular mitigating evidence)."[134] Appellant does not persuade us that *Raby*

---

[130] 59 S.W.3d 177, 180 (Tex. Crim. App. 2001).

[131] 121 S.W.3d 748, 755-58 (Tex. Crim. App. 2003).

[132] 189 S.W.3d 270, 270-72 (Tex. Crim. App. 2006).

[133] *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998) ("[T]he law does not require a juror to consider any particular piece of evidence as mitigating; all the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating.").

[134] *Id.* (citing *Green v. State*, 912 S.W.2d 189 (Tex. Crim. App. 1995)); *see also Davis v. State*, 313 S.W.3d 317, 346 (Tex. Crim. App. 2010) (following *Raby* and holding that the trial

was wrongly decided.  We therefore overrule appellant's twelfth point of error.

## B.     The Mitigation Instruction

In his thirteenth point of error, appellant claims that the trial court erred by refusing to instruct the jurors that they need not unanimously agree on what particular evidence supports an affirmative finding on the mitigation issue. Appellant invokes *Mills v. Maryland*[135] in support of his argument.  We addressed and rejected this same argument in *Segundo v. State*,[136] and appellant has not persuaded us that *Segundo* was wrongly decided. We overrule his thirteenth point of error.

## C.     The Definition of Mitigating Evidence

In his fourteenth and fifteenth points of error, appellant argues that the trial court should not have given the jury the statutory definition of mitigating evidence "as evidence that a juror might regard as reducing the defendant's moral blameworthiness."[137]  This same

---

court does not abuse his discretion in finding that appellant's questioning consider specific mitigation evidence was an improper commitment question); *Rosales v. State*, 4 S.W.3d 228, 233 (Tex. Crim. App. 1999) ("This Court has held on numerous occasions that an appellant is not entitled to voir dire prospective jurors on whether they could consider particular types of mitigating evidence during the capital sentencing phase.").

[135] 486 U.S. 367 (1988).

[136] 270 S.W.3d 79, 102-03 (Tex. Crim. App. 2008).

[137] TEX. CODE CRIM. PROC. art. 37.0711, § 3(f)(3) ("The court shall charge the jury that, in answering the issue submitted under Subsection (e) of this section [the mitigation issue], the jury . . . shall consider mitigating evidence that a juror might regard as reducing the defendant's moral blameworthiness.").

claim was rejected in *Roberts v. State*,[138] and appellant's arguments do not persuade us to overrule that case.  He also contends that the trial judge should have instructed the jury that there need be no nexus between the mitigating evidence and the capital murder because the mandatory statutory definition, he argues, implies that there must be a connection between the reduced moral blameworthiness and the capital offense itself.  We do not see any "nexus" requirement in the statutory definition.  Appellant relies upon *Tennard v. Dretke*,[139] but the Supreme Court, in that case, simply chastised the Fifth Circuit for *requiring* a nexus between the crime and the mitigating evidence.[140]  It never suggested that a jury can, should, or must be instructed not to consider any nexus between the crime and the mitigating evidence.  Such an instruction would be necessary only if the jury would be reasonably likely to infer a nexus requirement from the statutory words.[141]  That is not the case.  We overrule appellant's fourteenth and fifteenth points of error.

**D.     The Mitigation Issue**

In his sixteenth point of error, appellant relies on *Apprendi*[142] and *Ring*[143] to argue that

---

[138] 220 S.W.3d 521, 534 (Tex. Crim. App. 2007).

[139] 542 U.S. 274 (2004).

[140] *Id.* at 287 (rejecting any suggestion that its prior opinions would require a nexus between low I.Q. and the crime).

[141] *See Segundo*, 270 S.W.3d at 103.

[142] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[143] *Ring v. Arizona*, 536 U.S. 584 (2002).

Article 37.0711 is unconstitutional because it fails to require the State to prove beyond a

reasonable doubt that there are no mitigating circumstances that warrant a life sentence.  He

fails to mention that this Court has rejected that claim in numerous cases,[144] and he fails to

persuade us that our prior decisions were mistaken.

In his eighteenth point of error, appellant claims that the Texas death-penalty scheme

is unconstitutional under *Penry II*,[145]  because the mitigation issue sends "mixed signals" to

the jury, thus rendering any finding reached on that special issue unreliable.  *Penry II* is

distinguishable because, in that case, the jury was given a judicially crafted nullification

instruction.[146]  Here, the jury was given the statutorily mandated mitigation question, which

does not contain a nullification instruction.  No error exists, and we have repeatedly rejected

this claim.[147]  We overrule appellant's  eighteenth point of error

**E.    Constitutional Challenges to Art. 37.0711**

In his seventeenth point of error, appellant contends that the Texas death-penalty

statute gives the jury too much discretion and therefore permits arbitrary and inconsistent

---

[144] *See Segundo*, 270 S.W.3d at 102; *Crutsinger v. State,* 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Perry v. State,* 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Hankins v. State,* 132 S.W.3d 380, 387 (Tex. Crim. App. 2004); *Resendiz v. State,* 112 S.W.3d 541, 550 (Tex. Crim. App. 2003).

[145] 532 U.S. 782 (2001).

[146] *Id.* at 797-99.

[147] *See, e.g., Saldano v. State*, 232 S.W.3d 77, 107 (Tex. Crim. App. 2007); *Scheanette v. State,* 144 S.W.3d 503, 506 (Tex. Crim. App. 2004); *Jones v. State,* 119 S.W.3d 766, 790 (Tex. Crim. App. 2003).

application of the ultimate penalty.  We have repeatedly rejected this claim and appellant does not persuade us to overrule these prior cases.[148]  In fact, he fails to mention them.

In his nineteenth and twentieth point of error, appellant argues that the jurors should have been instructed on the consequences of a hung jury so that they would immediately stop deliberating if a single juror voted in appellant's favor on an issue that required unanimity. He also argues that the jurors should not have been instructed on the "10-12" Rule.  Although appellant fails to mention controlling precedent from this Court, we have repeatedly rejected these claims.[149]  We do so again.

In his twenty-first through twenty-third points of error, appellant argues that the statutory "future dangerousness" special issue is unconstitutional because the terms "probability," "criminal acts of violence," and "society" are not defined.  We have repeatedly rejected these claims,[150] and, although counsel suggests that we should revisit this precedent, we decline to do so.

In his twenty-fourth point of error, appellant contends that the statutory "future

---

[148] *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Turner v. State,* 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Shannon v. State*, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996); *Bell v. State*, 938 S.W.2d 35, 53-54 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995).

[149] *See, e.g., Resendiz v. State*, 112 S.W.3d 541, 548-49 (Tex. Crim. App. 2003); *Johnson v. State*, 68 S.W.3d 644, 656 (Tex. Crim. App. 2002); *Wright v. State,* 28 S.W.3d 526, 537 (Tex. Crim. App. 2000); *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *McFarland v. State*, 928 S.W.2d 482, 519 (Tex. Crim. App. 1996).

[150] *See, e.g., Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003); *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Earhart v. State*, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994).

dangerousness" special issue violates the Eighth Amendment because no one can reliably predict whether another person will commit acts of violence in the future and therefore this is an arbitrary factor. The "future dangerousness" aggravating factor has been recognized by the Supreme Court as properly narrowing the jury's consideration to ensure individualized sentencing as recently as two years ago in *Kennedy v. Louisiana*.[151] Although appellant asserts that only one other state, Oregon, requires a finding of future dangerousness in his effort to prove that a "national consensus" has developed against imposing the death penalty based on that factor, he fails to note that twenty-one other states include a defendant's possible future dangerousness among the aggravating circumstances to be considered at the sentencing stage of a capital case.[152] Furthermore, we have previously rejected this claim,[153] and we are not persuaded by appellant's arguments that our precedent should be overruled.

In his final point of error, appellant claims that the "future dangerousness" statutory scheme violates the Texas constitutional ban on cruel or unusual punishment. As appellant

---

[151] 128 S.Ct. 2641, 2661 (2008) ("The [Supreme] Court . . . has upheld the constitutionality of aggravating factors ranging from whether the defendant was a 'cold-blooded, pitiless slayer,' to whether the 'perpetrator inflict[ed] mental anguish or physical abuse before the victim's death,' to whether the defendant 'would commit criminal acts of violence that would constitute a continuing threat to society.'") (internal citations omitted; some internal quotation marks omitted).

[152] Jonathan R. Sorenson & Rocky L. Pilgrim, *Criminology: An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. & Criminology 1251, 1252 (2000) ("The goal of incapacitating dangerous offenders prompted twenty-one states to include a defendant's potential for future violence among the aggravating circumstances jurors may be directed to consider before reaching a punishment decision.").

[153] *See, e.g., McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993); *Joiner v. State,* 825 S.W.2d 701, 709 (Tex. Crim. App.1992).

acknowledges, we have already rejected this argument.[154] Appellant asserts that we now have before us his "evidence" that the "future dangerousness inquiry results in inaccurate, unreliable, arbitrary and disproportionate determinations." His evidence is the citation to an article written by the Texas Defender Service,[155] an advocacy group that represents inmates on death row. This is not the type of "evidence" upon which we can base a finding that the "future dangerousness" special issue is necessarily an unreliable factor to use in determining whether a life or death sentence is appropriate. Evidence proves historical facts; the "future dangerousness" special issue is a normative assessment mandated by the legislature and determined by the jury. Questions about its "appropriateness" as a factor in determining a life or death sentence should be addressed to the legislature. Furthermore, the article speaks of psychiatric predictions, not of the unreliability of jury verdicts. We overrule appellant's twenty-fifth point of error.

Having found no reversible error, we affirm the trial court's judgment and sentence.

Delivered: October 13, 2010

Publish

---

[154] *See Anderson v. State*, 932 S.W.2d 502, 509-10 (Tex. Crim. App. 1996); *see also Cantu v. State*, 939 S.W.2d 627, 639 (Tex. Crim. App. 1997).

[155] Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, 47-48 (2004).