# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00653-CR

**Albert Leonard Purdy, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT NO. 13487, HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Albert Leonard Purdy of the offense of indecency with a child by contact. Punishment was assessed at 18 years' imprisonment. In a single issue on appeal, Purdy asserts that the district court abused its discretion in admitting expert testimony that, in Purdy's view, was not relevant or reliable. We will affirm the judgment.

Purdy was charged with intentionally or knowingly engaging in sexual contact with his seven-year-old step-granddaughter.[1] Evidence presented at trial included the testimony of the victim, K.T.; the victim's mother, Lisa Clardy, the person to whom K.T. had first reported the contact; the police officers who had investigated the incident; Cheryl Gartner, the executive director of the Children's Advocacy Center in Bastrop County who had interviewed K.T. about the incident;

---

[1] In a separate, three-count indictment, Purdy was also charged with committing the offense of aggravated sexual assault of a child. The jury, however, acquitted him of this offense.

Mary Pierce, a sexual assault nurse examiner who had examined K.T.; Dr. Beth Nauert, a pediatrician who reviewed Pierce's findings and testified that she agreed with them; and Purdy, who testified in his defense and denied committing the offense. There was also evidence presented that Purdy had made the following statement to the victim's mother when she confronted him about the alleged abuse: "Well, I will say I did it, if it helps [K.T.] get through therapy." During Purdy's testimony, he admitted to making the statement in question. He claimed, however, that he made the statement out of concern for the "emotional turmoil" that he believed K.T. was experiencing.

At the center of this appeal, however, is certain testimony by psychologist Dr. William Lee Carter, an expert witness called by the State to testify in general terms about the dynamics of child sex-abuse from the perspective of both victims and perpetrators. The testimony at issue arose in the context of Carter's characterization of sex offenders as narcissistic, which Carter defined as "meaning they're doing what they want to do because of the pleasure it brings, the immediate pleasure it brings." The State asked Carter if he had heard of the term "narcissistic injury." Carter testified that he had, and explained the condition as follows:

> [W]hen they are caught or when they are found to be guilty of whatever they have done, many times they will emotionally collapse, express much remorse. That remorse may be genuine, but—in other words, the person has been psychologically injured by the fact that he has been caught in the act.
>
> Well, that's fine and it's good, and we're glad to see that, but we obviously wish that it didn't take a psychological blow for the person to see the harm or the damage that he was doing, for him to feel bad and to stop doing whatever it was he was doing.

The State then asked Carter, "So would that come into play, for example, for a perpetrator who is—once a child makes an outcry, and he is then confronted by, let's say, the parents of the child?"

2

Before Carter could answer, defense counsel objected, and the district court held a hearing outside the presence of the jury. Counsel explained that he anticipated that the State was going to ask whether "the narcissistic injury scenario that Dr. Carter talked about explain[s], when someone is confronted with having molested a child, that he would offer to admit that he had molested the child if it would help the child." Counsel requested "that the proponent of that scientific testimony carry the burden of showing that it's proper under Rules 702 and 705."

The State then proceeded to question Carter on voir dire. One of the questions the State asked was:

> So based upon the fact scenario that we have already developed, could you—in discussing, in particular, this narcissistic injury, would it be important for you to know if, in fact, in our fact scenario, a particular perpetrator did make some sort of statement in response to being—where the revelation of the outcry has come out, and being confronted with that, where he makes some sort of response that you would characterize as narcissism, could you state an opinion if you were given that particular information?

Carter answered,

> What I would say is that if, in the scenario you have, an accused man makes a conciliatory statement or gesture, I would want to know why. You know, that's as far as I would want to go for the jury, is to say that that's a significant or a meaningful factor to consider.
>
> I don't want to say that, because a person makes a conciliatory statement, that means—and then me fill in the blank. But I would say, and I would agree with you, that if a man makes a conciliatory statement like that, there is a reason that he says that and makes that statement, and it needs to be taken into consideration.

In response to this answer, defense counsel asked Carter:

3

Q.      What do you mean, 'it needs to be taken into consideration'?"

A.      When understanding a sexual abuse scenario, what I'm saying is, we need to look at things from both sides, both points of view. There is a reason a child says and does the things she says. There is a reason an adult says and does what he says or does. And we need to take all of that into account. Now, we don't say or do things without purpose. And so if a man is willing to say, okay, I'll admit to such-and-such if it will help ease things or, you know, smooth things over—well, he's saying that for a reason. And I don't want to interpret what that reason is, but I would say, and I would agree, if asked, that that statement means something.

Q.      Let me ask you:  Is that statement probative of anything?  In and of itself, based on the facts that you have, does it tend to prove or disprove any fact?

A.      No, it doesn't.

Defense counsel then urged that the testimony be excluded on grounds of relevance.  In response,

the State asked Carter:

Q.      Are you telling the judge that it's not probative of anything, or is it probative of your evaluation of the total scenario of the victim/perpetrator dynamic?

A.      [Defense counsel] makes a good point, and I have to agree with him when he says that, okay, if a man says to the family members, "Okay, if it helps matters, I'll say something." And I, of course, know what the facts are, and, you know, know what that element is.

What does that have to do with guilt or innocence?  Well, it's not a fact, necessarily, that weighs in on whether or not it happened.  And I understand that, and I recognize that. Now, I understand from your point of view, obviously, if a person is making a statement of that nature, it means something.  I'll agree with you.  It does mean something.  If a man sits in my office and explains to me all of that, that, "Yeah, I said that, and here's why," I may call his attorney after the fact and say, you know, "Your guy is in trouble, and he shouldn't have said that when he did."  But if we're going to get technical, which we obviously have to do, does it mean anything as to whether or not he did it?  No, I think we really can't say that.

Q.      Does it have anything to do with your scrutinizing, your evaluation, of the reliability of the outcry?

A.      Yes, it does, with me.

Defense counsel continued,

Q.      [H]ow are those bare facts that he said, what we know he said, how does that make it any less or more likely that the outcry was true?

A.      Well, in making that statement, that's not quite a confession, and so you can't say that he has confessed to the crime. I would say that, in making that statement, he is covering his rear end perhaps. He is trying to direct how people interpret whatever might occur next. You know, he's trying to, you know, control perhaps others' impressions of him. And so you would have those elements, but it doesn't constitute a confession, per se.

Q.      Basically, your take on this, or how you would explain to the jury how to use this would be, you know, "When I hear this, I have an opinion as to what it means as to the veracity of what he said or as to the—you're—I can tell from this statement what he was thinking when he said it"?

A.      If he were to make that statement to me in my office, I would interpret it as a statement on his part, meaning, "I realized at that point in time I was in trouble, and I needed to start doing some damage control." That's how I would interpret it, had he said it to me. Now, that doesn't mean that I'm correct. In a bet, I would bet on my own impression, because I've seen a lot of these people. But to say that "He made that statement, and therefore, de facto, it means this," I can't say that. I can only offer my professional opinion.

Q.      And what field of science are you relying on to base that opinion on?

A.      There's quite a bit of study that is done on, you know, sexual abuse at large, and the outcry process in particular. And of course, then, we're actually not talking about the outcry process here, as much as we are the aftermath of the outcry.

I can't say that I've read any studies about how accused sex offenders react and respond once they, you know, are confronted with, you know, the

accusations that have been made against them. That might be a good dissertation study for someone. I haven't read a study about that.

But I think that, you know, what [the prosecutor] is saying is, obviously, in studying the totality of the case, the response, the reaction, the scrambling around that the accused does once he is confronted, it's something that needs to be taken into consideration.

Q.   Can you name for me a peer reviewed journal that studies what the behavior of a perpetrator, along the lines of what we're talking about here, what it means?

A.   No, I can't.

Q.   And to your knowledge, has one ever been written?

A.   Not to my knowledge. Of course I haven't read everything that has been written about that. But no, I can't say that I have read, and I rather doubt that there are, studies of that nature out there.

Q.   Has your opinion on these matters ever been peer reviewed?

A.   No.

Q.   Have you ever offered an opinion like this before?

A.   Not that particular point. Now, I am asked sometimes about, you know, narcissism when we talk in court about the abuse from the perpetrator's point of view. I do get asked about that, but I've not been asked that particular question in that particular way, that I can recall, while I'm on the witness stand.

Q.   Psychology is a field of science in that respect and you agree with that?

A.   Yes.

Q.   Scientific method involves coming up with a hypothesis, testing the hypothesis through empirical study, and validating the hypothesis?

A.   Correct.

6

Q. In relation to the opinion that we're talking about, none of that has been done, has it?

A. Right.

Based on the above, defense counsel argued that Carter's opinion on the meaning of Purdy's statement was not reliable and not "probative of anything." In the alternative, counsel argued that, "due to the lack of scientific validation, the prejudicial nature of it far outweighs any probative value." Counsel added, "And it is certainly prejudicial to have someone with Dr. Carter's expertise give the force of his licensure, of his experience, to an unscientific opinion."

The district court sustained the objection in part but overruled it in part. It explained:

> Well, the Court will find that the witness is qualified to render the opinion. If the—what I'm going to do, and the way I heard the doctor testify, and looking at all of the facts of the situation, if the doctor's opinion is that he—that if somebody makes this statement, it just needs to be taken into consideration. I will find that that will assist the trier of fact, and the Court will find that it is, in fact, relevant and reliable.
>
> I will sustain the defense objection to "it means something." I think that goes past it. So I will allow the doctor to testify as to that if someone makes a statement, that that just needs to be taken into consideration when you're doing a complete evaluation of a situation. I find that that is relevant and reliable in this situation. But I will sustain the objection as to—that "it means something."

The district court also overruled Purdy's Rule 403 objection.

After the jury returned, the State asked Carter the following question:

> So Dr. Carter, we were discussing the term, "narcissistic injury," and I began to ask you a question that I will now complete.

7

If a man is confronted by the family members of a child that he has now been accused of a sexual offense, if his response is, "I'll say I did it if it will help her in her counseling," what does that mean? Is it important for you to know?

Carter answered, "Yes, it is important for me to know, and it's something that I would take into account." No further testimony on this point was elicited.[2]

It is this particular testimony—and only this testimony—that forms the basis of Purdy's appeal.[3] In his sole issue, Purdy asserts that the district court abused its discretion in allowing the State to elicit the above testimony that, in Purdy's view, was neither relevant nor reliable. In response, the State claims that the testimony was admissible. In the alternative, the State argues that any error in admitting the testimony was harmless.

Assuming without deciding that the challenged testimony should not have been admitted, we cannot conclude on this record that Purdy was harmed by its admission. The erroneous admission of expert testimony is non-constitutional error. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Accordingly, any error must be disregarded unless it affected Purdy's substantial rights. *See* Tex. R. App. P. 44.2(b); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such error is harmless. *Id*. (citing *Johnson v. State*,

---

[2] Immediately following Carter's answer, the State passed the witness, and neither side returned to the issue during later questioning.

[3] As the State observes, Purdy does not challenge any other aspect of Carter's testimony.

8

967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). "In making a harm analysis, we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence." *Id*. (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Miles v. State*, 918 S.W.2d 511, 517 (Tex. Crim. App. 1996)). Factors to consider in our analysis include any testimony or physical evidence admitted for the jury's consideration; the nature of the evidence supporting the verdict; the character of the alleged error and how it might be considered in connection with other evidence in the case; the jury instructions; the State's theory and any defensive theories; closing arguments; voir dire, if applicable; and whether the State emphasized the error. *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002). We are also to consider "overwhelming evidence of guilt." *Id*. at 357.

In this case, the evidence of Purdy's guilt can be fairly characterized as strong. The victim, K.T., a young girl, testified in court that she "got touched in an inappropriate spot" by a man she called "Leonard." K.T. pointed to and identified Purdy as the man who had touched her. When asked to describe where she got touched, K.T. testified that she was referring to her "front part," specifically "the place where we go pee." K.T. added that Purdy "touched the outside" of this part of her body "us[ing] his private," which K.T. identified as "[w]here he goes pee."

K.T.'s testimony was corroborated by several witnesses to whom K.T. described the contact. These witnesses provided consistent accounts of what K.T. had described to them. K.T.'s mother, Lisa Clardy, testified that K.T. told her that she had been touched in an inappropriate place by "Peepaw," which, according to Clardy, was what K.T. called Purdy. K.T. subsequently told

9

Clardy that Purdy "had rubbed her flower," which Clardy testified was a reference to the child's sexual organ.

Other evidence considered by the jury included the testimony of Cheryl Gartner, the executive director of the Children's Advocacy Center in Bastrop County who had interviewed K.T. about the incident. Gartner testified that K.T. told her that "Peepaw had been touching her on her private." Gartner also testified that K.T., "throughout the course of the interview, described to me that he would rub his private on her private, with her panties down." Gartner added that she had diagrams depicting male and female body parts and that K.T. identified on these diagrams the body parts that "Peepaw" touched and that she also identified the private parts of "an elderly man."[4] Gartner further testified that K.T. described where the touching occurred, described "multiple events," and was able to provide sensory details of how her sexual organ felt after the contact occurred.

Similar testimony was elicited from Mary Pierce, the sexual assault nurse examiner. Reading from her report, a copy of which was admitted into evidence, Pierce testified that K.T. told her,

> Someone touched me where they're not supposed to touch me. It was Grandpa Peepaw. I was asleep and then woke up. Grandpa Peepaw was rubbing me on my private part with my clothes on. He was—he was laying beside me. This happened every day when my grandma isn't there. This happened yesterday, the last day he babysitted me.

---

[4] Gartner testified that K.T. was given the option of identifying a "middle-aged man" or "an older man" and that K.T. chose "the older man." Purdy was 62 years old at the time of trial.

10

Pierce testified that this was "an accurate quotation that came from [K.T.'s] mouth." Pierce also testified to her diagnostic impressions, which included that "exam findings can be attributed to both traumatic and non-traumatic causes" and that "[h]istory supports sexual contact/abuse, so findings may be consistent with history provided." Dr. Beth Nauert, a pediatrician with extensive experience examining children in sexual-assault cases, testified that she had reviewed the records of the examination in this case and that she agreed with Pierce's findings.

In addition to the evidence of guilt summarized above, there are other factors that persuade us that the challenged testimony did not influence the jury or had but a slight effect upon its deliberations. First, Carter's challenged testimony was limited—only one question was asked regarding Carter's interpretation of Purdy's statement, and Carter's answer was merely that Purdy's statement was "important for [him] to know" and that "it's something that I would take into account." Carter did not elaborate on how that statement was important to him, or specify in what way he would "take into account" such a statement. Purdy's statement was admitted into evidence prior to Carter's testimony, and Purdy himself attempted to explain the statement during his testimony. Thus, even without Carter's testimony, the jury likely realized that such a statement was "important" and needed to be "taken into account" when evaluating the case. Also, the State did not emphasize Dr. Carter's testimony in its closing argument, and it did not specifically mention the challenged testimony. Instead, the State emphasized K.T.'s testimony and the testimony of the other witnesses who had personal knowledge of the case. Similarly, defense counsel, during his closing argument, did not emphasize the challenged testimony. We also observe that the jury, during its deliberations, requested a transcript of K.T.'s testimony. No such transcript of Carter's testimony

11

was requested.  On this record, we cannot conclude that any error in admitting the challenged testimony had a substantial and injurious effect or influence in determining the jury's verdict.

We overrule Purdy's sole issue on appeal.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   August 24, 2011

Do Not Publish